1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  RENÉ A. CHACÓN, State Bar No. 119624
   Supervising Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 703-5957
    Fax:  (415) 703-1234
8   Email:  rene.chacon@doj.ca.gov

9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                       OAKLAND DIVISION

13

14  **LIONEL RUBALCAVA,**                    No. C 07-5379 SBA

15                              Petitioner,

16        **v.**

17  **TOM FELKER, Warden,**

18                              Respondent.

19

20  **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER**

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2 **Page**

3 INTRODUCTION                                                                 1

4 STATEMENT OF THE CASE                                                        2

5 LEGAL STANDARDS                                                              2

6 STATEMENT OF FACTS                                                           3

7          April 5, 2002, Assault On Raymond Rodriguez                        3

8          Percipient Witnesses To The Shooting                               4

9          Petitioner's April 7, 2002, Contact With Jennifer                  5

10         The Investigation                                                  5

11         David Gonzalez, Jr.                                                6

12         Criminal Street Gang Expert                                        7

13         Defense Case                                                       9

14         Rebuttal Case                                                      11

15 ARGUMENT                                                                   12

16     I.    THE   RECORD   DOES   NOT   DEMONSTRATE   JUROR
             MISCONDUCT                                                       12

17
             A.   Factual Background                                          12
18
             B.   Court Of Appeal Findings                                    13
19
             C.   No Misconduct Demonstrated                                  15
20
       II.   THERE   WAS   NO   VIOLATION   OF   *CRAWFORD   V.*
21           *WASHINGTON*                                                     15

22     III.  PETITIONER   DOSE   NOT   DEMONSTRATE   ACTUAL
             INNOCENCE                                                        17
23
    CONCLUSION                                                                21
24

25

26

27

28

1

# TABLE OF AUTHORITIES

2                                                                                        **Page**

3  **Cases**

4  *Allen v. Woodford*,
5  395 F.3d 979, 994 (9th Cir.),
   *cert. denied* 126 S.Ct. 134 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

6  *Carey v. Musladin*,
   127 S.Ct. 649 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
7
   *Carriger v. Stewart*,
8  132 F.3d 463, 476 (9th Cir. 1997) (*en banc*) . . . . . . . . . . . . . . . . . . . . 18-19

9  *Coley v. Gonzales*,
   55 F.3d 1385 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
10
   *Cooper v. Woodford*,
11 358 F.3d 1117, 1119 (9th Cir.),
   *cert. denied* 541 U.S. 1057 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
12
   *Crawford v. Washington*,
13 541 U.S. 36 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-17

14 *Dobbert v. Wainwright*,
   468 U.S. 1231 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
15
   *Edwards v. Lamarque*,
16 476 F.3d 1121, 1126 (9th Cir. 2007) (en banc) . . . . . . . . . . . . . . . . . . . . . 3

17 *Herrera v. Collins*,
   506 U.S. 390 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19
18
   *House v. Bell*,
19 126 S.Ct. 2064 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

20 *In re Hitchings*
   (1993) 6 Cal.4th 97 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14
21
   *In re Weber*,
22 11 Cal.3d 703, 724 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

23 *Lockyer v. Andrade*,
   538 U.S. 63, 75 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
24
   *McDonough Power Equip., Inc. v. Greenwood*,
25 464 U.S. 548, 556 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

26 *People v. Butler*
   (2005) 127 Cal.App.4th 49 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
27
   *People v. Johnson*
28 (2004) 121 Cal.App.4th 1409 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**TABLE OF AUTHORITIES  (continued)**

Page

*People v. Mayfield*
(1997) 14 Cal.4th 668                                                    17

*People v. McNeal*
(1979) 90 Cal.App.3d 830                                                 14

*People v. Saffold*
(2005) 127 Cal.App.4th 979                                              17

*People v. Thomas*
(2005) 130 Cal.App.4th 1202                                          15, 16

*Schlup v. Delo*,
513 U.S. 298 (1995)                                                     18

*Smith v. Baldwin*,
2007 U.S. App. LEXIS 29743, *23 (9th Cir. 2007)                         19

*Tennessee v. Street*

471 U.S. 409 (1985)                                                     17

*United States v. James*,
487 F.3d 518 (7th Cir. 2007)                                             3

*Woodford v. Visciotti*,
537 U.S. 19, 24 (2002) (per curiam)                                      3


**Constitutional Provisions**

Fifth Amendment                                                        17

Sixth and Fourteenth Amendments                              12, 13, 15, 17


**Statutes**

28 U.S.C. § 2254                                                   1, 3, 15

Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)        2, 3

Cal Pen. Code,
        § 186.22(b)(1)                                                1, 2
        § 187                                                        1, 2
        § 189                                                           2
        § 664                                                        1, 2
        § 667(a)                                                     1, 2
        § 667(b)-(i)                                                 1, 2
        § 667.5(b)                                                   1, 2

**TABLE OF AUTHORITIES  (continued)**

**Page**

§ 1170.12                                                1, 2
§ 1203(d)(3)                                                1
§ 1203(e)(3)                                                2
§ 120227(a)                                              1, 2
§ 12022.53(b)-(d)                                        1, 2

Evidence Code,
§ 801, subd. (b)                                          16
§ 1200                                                    17

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  RENÉ A. CHACÓN, State Bar No. 119624
   Supervising Deputy Attorney General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 703-5957
     Fax:  (415) 703-1234
8    Email:  rene.chacon@doj.ca.gov

9  Attorneys for Respondent

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE NORTHERN DISTRICT OF CALIFORNIA

12

13  **LIONEL RUBALCAVA,**                        No. C 07-5379 SBA

14                              Petitioner,      **MEMORANDUM OF POINTS
                                                 AND AUTHORITIES IN**
15          **v.**                               **SUPPORT OF ANSWER**

16  **TOM FELKER, Warden,**

17                              Respondent.

18

19

20                       **INTRODUCTION**

21          Petitioner, Lionel Rubalcava, is presently serving a 25 years to life, plus 6-year sentence

22  for convictions of attempted premeditated murder, Cal. Penal Code §§ 187, 664, with findings that

23  petitioner personally discharged a handgun causing great bodily injury, Cal. Penal Code §§

24  1203(d)(3), 120227(a), 12022.53(b)-(d), that the offense was committed for the benefit of a criminal

25  street gang, Cal. Penal Code § 186.22(b)(1), that petitioner had a prior strike conviction, Cal. Penal

26  Code §§ 667(b)-(i), 1170.12, a prior serious felony conviction, Cal. Penal Code § 667(a), and a prior

27  prison term commitment, Cal. Penal Code § 667.5(b).  On October 22, 2007, petitioner filed the

28  instant petition for writ of habeas corpus under 28 U.S.C. § 2254.  On November 8, 2007, the Court

1  issued the Order to Respond.  *See* Order to Respond.

2
### STATEMENT OF THE CASE
3

4      By information the Santa Clara District Attorney charged petitioner with attempted

5  premeditated murder, Cal. Penal Code §§ 187, 189, 664.  *See* Respondent's Exhibit A at 260-63

6  (Clerk's Transcript hereinafter referred to as "CT").  The information alleged that petitioner

7  personally discharged a handgun causing great bodily injury, Cal. Penal Code §§ 1203(e)(3),

8  120227(a), 12022.53(b)-(d), and that the offense was committed for the benefit of a criminal street

9  gang, Cal. Penal Code § 186.22(b)(1).  *Id.*  The information alleged one prior strike, Cal. Penal Code

10  §§ 667(b)-(i), 1170.12, a prior serious felony conviction, Cal. Penal Code § 667(a), and one prior

11  prison term commitment, Cal. Penal Code § 667.5(b).  CT at 262.

12      Trial by jury commenced on November 10, 2003.  CT at 396.  On November 26, 2003,

13  the jury found petitioner guilty as charged and found true all attendant enhancement allegations.  CT

14  at 482-85.  Petitioner admitted the prior conviction allegations.  CT at 486.

15      On August 6, 2004, the trial court imposed an indeterminate 25 years to life sentence and

16  a consecutive determinate six-year term.  CT at 621-24.

17      On December 28, 2005, the California Court of Appeal affirmed the judgment in an

18  unpublished decision.  *See* Respondent's Exhibit B.

19      On March 15, 2006, the California Supreme Court denied the petition for review.  *See*

20  Respondent's Exhibit C.

21      On August 15, 2007, the California Supreme Court denied the petition for writ of habeas

22  corpus.  *See* Respondent's Exhibit D.

23      On October 22, 2007, petitioner filed the instant petition for writ of habeas corpus under

24  28 U.S.C. § 2254.  On November 8, 2007, the Court issued the Order to Respond.

25
### LEGAL STANDARDS
26

27      This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996

28  (AEDPA), which imposes a "highly deferential" standard for evaluating state court rulings and

"demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). Under AEDPA, the federal court has no authority to grant habeas relief unless the state court's ruling was "contrary to, or involved an unreasonable application of," clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1). A decision constitutes an unreasonable application of Supreme Court law if the state court's application of law to the facts is not merely erroneous, but "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). Thus, "[o]nly if the evidence is 'too powerful to conclude anything but' the contrary" should the court grant relief. *Edwards v. Lamarque*, 476 F.3d 1121, 1126 (9th Cir. 2007) (en banc). The petitioner bears the burden of showing that the state court's decision was unreasonable. *Visciotti*, 537 U.S. at 25.

## STATEMENT OF FACTS

### April 5, 2002, Assault On Raymond Rodriguez

While living on San Miguel Way and on Panama Avenue, Raymond Rodriguez was a member of the Varrio East Side Norteño gang. *See* Respondent's Exhibit F at 81-82 (reporter's transcript of trial hereinafter referred to as "RT"). Rodriguez considered Sureño gang members his rivals. RT at 84. In April 2002, Rodriguez moved to a home on Mastic Street, in West Side Mob gang territory. RT at 86-88. On April 5, 2002, Rodriguez accompanied friends and family members to a theater to watch a movie. RT at 78, 94. Arriving home in the late afternoon, Rodriguez visited with his neighbor, David Gonzalez, Jr., accompanied by his friend Daniel Cerecerez. RT at 95. The friends visited on Gonzalez's front lawn. RT at 95. Rodriguez saw a blue SUV truck travel "slowly" down Mastic Street toward Humboldt Street. RT at 97-99. The truck made a U-turn and headed back. RT at 100. Rodriguez walked to the curb. RT at 102. The truck stopped in front of Rodriguez's home. RT at 102-03. At trial, Rodriguez identified petitioner as the driver of the truck. RT at 116.

Petitioner looked forward toward Goodyear Street, then turned to look at Rodriguez. RT at 106-07. Rodriguez raised his hands and said, "'What's up?'" to petitioner. RT at 107. Rodriguez approached petitioner's car to check on whether petitioner had a problem with Rodriguez. RT at

110-11. Petitioner did not say a word, raised a gun and shot Rodriguez. RT at 107, 112. Two other men were inside the truck with petitioner that day. RT at 119-20. The gunshot caused Rodriguez paralysis from the waist down. RT at 126. Rodriguez continues to experience depression and anxiety. RT at 127. Rodriguez identified petitioner's photograph from a lineup. RT at 129. Rodriguez was wearing a red belt with the letter "N" that day which signified his gang affiliation. RT at 109, 118.

**Percipient Witnesses To The Shooting**

Fourteen-year-old Eric was Rodriguez's younger brother. RT at 152. Eric saw a green Toyota stopped "in front of the street." RT at 162. At trial, Eric identified petitioner as the driver. RT at 172. Petitioner "looked strange" at Rodriguez. RT at 167. Rodriguez went out to the street and said, "'What's up?'" RT at 168. Petitioner pulled out a black gun with his left hand and shot once at Rodriguez. RT at 170-73. Eric identified petitioner's photograph from a lineup. RT at 178, 553, 581.

On April 5, 2002, Nicholas Faria was visiting at David Gonzalez's residence. RT at 255. Faria was outside on the lawn. RT at 258. Faria gave police a statement following the shooting. RT at 259. Faria did not remember what happened that day. RT at 260. Faria told the police that the Toyota 4Runner drove up close to 1119 Mastic, slowed down, then stopped. RT a 261. Faria saw a person shot but could not recall the details. RT at 262.

San Jose Police Officer David Gonzalez took Faria's statement. RT at 278. Faria was uncooperative but eventually gave a statement. RT at 278. While moving his car to a parking spot by 1196 Mastic Street, Faria saw a black Toyota 4Runner drive by slowly then make a U-turn. RT at 280-81. The Toyota slowed and stopped in the middle of the street. RT at 281. The driver motioned to the victim to come over. RT at 282. Faria described the driver as a Hispanic male, 17 to 24 years old, with a shaved head. RT at 282. When the victim was 10 feet from the driver, the driver pointed a black semiautomatic handgun out the window and shot the victim. RT at 282. The victim raised his hands in the air and said that he had been shot. RT at 283. The Toyota sped away. RT at 283. Faria feared for his own safety, believing the shooting was gang related. RT at 283.

Daniel Cerecerez described petitioner as a friend and neighbor. RT at 286-87. Petitioner

drives a black pickup truck. RT at 287-88. Cerecerez has a tattoo on the back of his head bearing the letters "WS" for Westside. RT at 289. In the past, Cerecerez was affiliated with the West Side Mob and the Varrio Horseshoe gang. RT at 292. Cerecerez identified petitioner as a member of the West Side Mob and admitted hanging out with petitioner in the past. RT at 293. In August 2001, Cerecerez was stabbed by a Varrio Horseshoe gang member for a slight committed by Cerecerez's cousin. RT at 296. Cerecerez's cousin, David Holmes, had engaged in a fight with a Varrio Horseshoe member. RT at 297. After being stabbed, Cerecerez went to petitioner's home to seek assistance. RT at 296. Cerecerez described Raymond Rodriguez as a friend and a Norteño gang member. RT at 301, 303. David Gonzalez, Jr. told Cerecerez that he hung out with Varrio Horseshoe gang members. RT at 305.

On the day of the shooting, Cerecerez saw a black truck pull up. RT at 316. The truck stopped, and the occupants were talking to Raymond Rodriguez. RT at 318. Cerecerez heard one gunshot and Cerecerez ducked. RT at 322-23. Cerecerez described the truck passenger as a Hispanic man with a bald head who wore a tank top. RT at 324.

Alejandro Borrego was visiting with David Gonzalez, Jr. RT at 370. While talking with Cerecerez by Borrego's car, Borrego noticed a sport's utility vehicle driving by. RT at 376. Borrego described the truck as possibly dark blue. RT at 377.

**Petitioner's April 7, 2002, Contact With Jennifer**

Seventeen-year-old Jennifer identified Rodriguez as her older brother. RT at 201. Jennifer heard a gunshot while she was in the living room of her home. RT at 205. Jennifer went outside and saw Rodriguez on the ground. RT at 205. Jennifer saw a "'pickup truck'" moving away from the area. RT at 206. On Sunday, April 7, 2002, Jennifer was outside of her residence when someone in a light-colored truck drove up. RT at 213-14. The truck drove up near Jennifer's home and its two male occupants called her over. RT at 215. At trial, Jennifer identified petitioner as the pickup truck's driver. RT at 222. Petitioner was handling something dark in color. RT at 216. Jennifer refused petitioner's invitation to join him in the truck. RT at 216. Jennifer identified petitioner's photograph for police. RT at 223.

**The Investigation**

1

2       San Jose Police Officer Joe Perez showed the victim a photo lineup. RT at 397. The

3   victim identified petitioner's photograph. RT at 400. Later, Officer Perez showed Jennifer a photo

4   lineup and she identified petitioner as the driver of the pickup truck that drove up to her residence

5   on Sunday, April 7. RT at 402-03.

6       San Jose Police Officer Mark Hawke contacted the victim at the hospital and heard the

7   victim describe the truck as a green Toyota 4Runner containing two Hispanic men. RT at 366-67.

8       By stipulation, the parties informed the jury that a 911 call reporting the shooting was

9   received on April 5, 2002, at 5:29 p.m. RT at 627-28, 933.

10      On April 5, 2002, Aurora Molina reported her four-door green Toyota 4Runner stolen.

11  RT at 240. When police recovered the truck, it had been burned down to the frame and was parked

12  in a junk yard. RT at 241.

13      On April 5, 2002, at about 9:30 a.m., San Jose Police Officer Randy Schriefer responded

14  to a report of a vehicle fire and recovered Molina's stolen truck. RT at 249-50. The truck was found

15  about 1.5 miles from the scene of the shooting. RT at 251.

16  **David Gonzalez, Jr.**

17      David Gonzalez, Jr., testified the he considers himself an associate member of the Varrio

18  Horseshoe Norteño gang. RT at 430. He has also associated with the "San Jo Grande" Norteño

19  gang. RT at 441. Before the shooting, Gonzalez was aware of tension between Varrio Horseshoe

20  gang members and West Side Mob gang members. RT at 447. Gonzalez knew the victim was a

21  Norteño gang member. RT at 450. Gonzalez recognized the driver of the green Explorer truck. RT

22  at 458-59. Gonzalez made eye contact with the driver. RT at 461. In December 2001, the driver

23  had driven to Gonzalez's home and had tried to lure Gonzalez into his car. RT at 462.

24      On the day of the shooting, Gonzalez became concerned for the safety of his father. RT

25  at 469. Gonzalez warned his friends to get off the street. RT at 470. From the side of his home,

26  Gonzalez heard one gunshot. RT at 474. Later, on Sunday, April 7, about 9:00 p.m., a black pickup

27  truck drove up to Gonzalez's home. RT at 481. Gonzalez entered his home and locked the door.

28  RT at 483. Gonzalez later told police that the driver of the pickup truck was the shooter and that the

1  driver's name was Lionel Rubalcava who lived on Palm Street.  RT at 486.  Gonzalez identified

2  petitioner's photograph for police.  RT 489, 552, 577.  Gonzalez feared he was petitioner's true

3  target on April 5, 2002.  RT at 493.

4        San Jose Police Officer Steven Spillman contacted David Gonzalez who described the

5  truck as a blue or green Toyota 4Runner.  RT at 543.  Gonzalez reported that he had seen the driver

6  before in his neighborhood and at his home, but did not know his name.  RT at 544.  The driver had

7  come to Gonzalez's door, "ranting" about Sureños, wanted to know Gonzalez's gang affiliation, and

8  appeared to Gonzalez to "be crazy."  RT at 544.  On the day of the shooting, Gonzalez told

9  Raymond Rodriguez and Daniel Cerecerez to go inside.  RT at 545.  As to the driver of the black

10  pickup truck who appeared on April 7, Gonzalez reported it was the same person as the shooter.  RT

11  at 546.  Gonzalez offered to lead police to the place where he had seen the black pickup truck parked

12  before.  RT at 546.  Gonzalez led officers to the area of Palm and Willow Streets.  RT at 547.  There,

13  police observed a truck parked at 955 Palm Street that Gonzalez said was "very similar" to the truck

14  petitioner drove.  RT at 547.  Later, police drove Gonzalez around the neighborhood in an unmarked

15  patrol car looking for petitioner.  RT at 550.  Gonzalez eventually reported petitioner's name.  RT

16  at 550.  On April 8, 2002, about 11:17 p.m., Officer Spillman stopped petitioner, who was driving

17  a GMC pickup truck.  RT at 554-55.

18        Officer Topui Fonua contacted David Gonzalez on April 7, 2002, about 9:00 p.m. and

19  again the next day.  RT at 570.  Gonzalez said petitioner was the person who had confronted

20  Gonzalez at his home about one month before the shooting, drove down Mastic Street before the

21  victim was shot, and pulled up in his pickup truck on April 7 to confront the victim's family

22  members.  RT at 578.

23  **Criminal Street Gang Expert**

24        San Jose Police Officer Rafael Nieves qualified as an expert on criminal street gangs in

25  San Jose.  RT at 55-56.  Nieves testified that the West Side Mob is affiliated with the Norteño street

26  gang.  RT at 59.  Two West Side Mob members, Jaime Valenzuela and Chad Cleveland, were

27  recently prosecuted for a gang-related homicide.  RT at 59-60.  The West Side Mob is found in the

28  area near Alma and Pomona Streets.  RT at 60.  The gang Varrio Horseshoe is another gang

1  affiliated with the Norteño street gang. RT at 63. The Varrio Horseshoe gang is found on the west

2  side of Highway 87. RT at 63. The Varrio Horseshoe gang adopts the color red and the number 14.

3  RT at 63. Norteño affiliated gangs can become rivals if assaults occur or narcotics activities

4  conflict. RT at 63. In April 2002, Officer Nieves became aware of a conflict between the West Side

5  Mob and the Varrio Horseshoe gang members. RT at 64. A Varrio Horseshoe tag was defaced by

6  a West Side Mob tag. RT at 64. Also, simmering anger resulted from West Side Mob members

7  frequenting Bierbach park, which was in the middle of Varrio Horseshoe territory, and "tag[ged] up

8  in Varrio Horseshoe area." RT at 65. Further, West Side Mob members were concerned with a

9  perceived "disrespect" shown by a Varrio Horseshoe member to a West Side Mob member's

10  girlfriend. RT at 65. Finally, both gangs competed for low-level narcotics territory. RT at 65-66.

11  Officer Nieves knew petitioner as an active West Side Mob gang member. RT at 67.

12       Officer Nieves reported that the West Side Mob engages in homicide, robbery, aggravated

13  assaults, threats, and vandalism. RT at 590. The West Side Mob has adopted the color red, the

14  number 14, and the initials "WSM." RT at 591. Nieves identified Chad Cleveland as a West Side

15  Mob member who shot at two Mexican nationals, striking one in the leg and killing the other. RT

16  at 591-92. A jury convicted Cleveland of murder. RT at 592. Jaime Valenzuela is a West Side Mob

17  member who stabbed a rival gang member to death in retaliation for his car being vandalized. RT

18  at 593-94. West Side Mob gang member Joseph Sullivan stabbed a man dating Sullivan's ex-

19  girlfriend and yelled out "Mob" and his moniker "Rojo" during the stabbing. RT at 594-95.

20  Sullivan was convicted of aggravated assault with an allegation of personal infliction of great bodily

21  injury. RT at 595. Nieves identified a photograph depicting petitioner, Michael Heath, Joe Sullivan,

22  Julian Sanchez, Jesse Chavaria, Juan Garcia, Jaime Valenzuela, and other West Side Mob gang

23  members. RT at 596-97.

24       A field interview card showed that on August 21, 2001, petitioner admitted being affiliated

25  with the West Side Mob and that his nickname was "Little Lionel." RT at 597. Another field

26  interview card showed that on June 29, 2001, petitioner reported his affiliation with the West Side

27  Mob and that his moniker was now "Omar." RT at 598. In May 2001, petitioner was contacted at

28  1081 Palm Street, the residence of Mob members Dennis Holmes and Daniel Cerecerez, and claimed

not to associate with the Mob.  RT at 598.  In October 2000, petitioner was accompanied by Mob member Gilbert Quinones.  RT at 598-99.  In March 2000, petitioner was seen at 650 Drake Street in the company of West Side Mob gang members who fled upon the arrival of police.  RT at 599.  Petitioner was found hiding inside a closet and he stated he was on active probation conditioned on no association with gang members.  RT at 599.  In October 1998, petitioner told police that he and his family had been affiliated with the West Side Mob for a "long" time.  RT at 600.  In March 1998, petitioner reported being affiliated with the West Side Mob.  RT at 600.  A seized letter from a jail inmate was signed by petitioner and referred to the West Side Mob gang.  RT at 602.  Officer Nieves opined that the assault on Raymond Rodriguez was committed for the benefit of the West Side Mob gang.  RT at 603.

**Defense Case**

Monica Cerecerez is Daniel Cerecerez's sister.  RT at 636.  In December 2001, Monica was inside a gray truck that stopped by David Gonzalez's home.  Gonzalez asked Monica for a cigarette.  RT at 637.  Monica asked Gonzalez to sell her methamphetamine.  RT at 638.  While talking with Gonzalez, Monica observed a "weird man" in a car "circling the place" and staring at Monica and Gonzalez.  RT at 638.  The man spoke with Monica's neighbor in Spanish.  RT at 639.  Later, Monica heard Gonzalez state that the "weird" man was in fact petitioner.  RT at 640.  Monica told Gonzalez that petitioner was not the "weird" man.  RT at 641.

Stephanie Leon knew petitioner as "James" and joined him on April 5, 2002 on a date to see a movie.  RT at 657-58.  Stephanie talked with petitioner by phone at 4:30 p.m. to firm up their plans.  RT at 659.  The couple saw a 7:00 p.m. movie in Hollister.  RT at 658-59.

By stipulation, the jury was told that Eric initially described the shooter to police as a Hispanic male with "black shaved hair and a light mustache."  RT at 709-10.  The next day, Eric described the shooter as a Hispanic male with a "very short buzz type cut hairstyle" and a thin mustache.  RT at 710.

Homicide detective Edgardo Garcia interviewed Raymond Rodriguez at the hospital.  RT at 714.  Rodriguez described the shooter as a Hispanic male, 19 to 25 years old, who wore a gray sweatshirt and a red hat.  RT at 715.  Rodriguez said, "'They were probably some fucking scraps.'"

1    RT at 715.  Initially, Rodriguez said he recognized "his homeboy Jose" as a vehicle occupant.  RT

2    at 716.

3         Police sergeant Michael Brown heard Rodriguez describe the shooter as a "Hispanic male

4    in his early to mid-20's with a thin mustache and goatee, thin build, wearing a black baseball cap

5    with a gray brim, a black and gray sweatshirt."  RT at 719.

6         Petitioner testified that he is 25 years old and is right hand dominant.  RT at 721-22.

7    Petitioner was never "jumped out" of the West Side Mob gang.  RT at 722.  Petitioner considered

8    himself "separated" from the gang.  RT at 722.  Petitioner joined the gang at 13 or 14 years of age.

9    RT at 722.  Petitioner admitted writing the seized letter (People's Exhibit No. 22) to jail inmate

10   Steven Salcedo.  RT at 724-25.  Salcedo is a West Side Mob member.  RT at 727.  Petitioner chose

11   to align himself with a Norteño gang while a jail inmate.  RT at 727.  His brother, Rolando, is an

12   associate of the West Side Mob gang.  RT at 730.

13        Petitioner did not personally know David Gonzalez but had seen him once at Daniel

14   Cerecerez's home.  RT at 742.  Petitioner denied going to Gonzalez's home in December 2001.  RT

15   at 742-43.  Petitioner denied taking or driving Aurora Molina's truck.  RT at 744.  Petitioner dated

16   Stephanie Leon on April 5, 2002.  RT at 748.   Petitioner planned to drive to Hollister and meet

17   Stephanie at a McDonald's Restaurant.  RT at 754.  Petitioner left San Jose for Hollister sometime

18   after 4:45 p.m., around 5:05 or 5:15 p.m.  RT at 756, 811.

19        On April 7, 2002, petitioner was driving with a friend named Peter when he stopped at a

20   residence on Mastic Street.  RT at 766.  Petitioner stopped his truck to say hello to a cute girl.  RT

21   at 766.  Petitioner focused on a girl named Jennifer.  RT at 767.  Jennifer reported that her brother

22   had been shot on Friday, and that information surprised petitioner.  RT at 830-31.  In 2002, Varrio

23   Horseshoe gang members flagged petitioner down and they conversed.  Petitioner resolved his

24   differences with those gang members.  RT at 770-71.

25        Petitioner denied shooting Raymond Rodriguez.  RT at 773.  Petitioner admitted being

26   convicted in 1999 of second degree burglary.  RT at 780.  Petitioner was also convicted in 1999 of

27   making terrorist threats.  RT at 734, 780-81.  Petitioner said his cell phone number is 205-3914 and

28   that it is registered under his mother's name, Maria Gutierrez.  RT at 809.  Petitioner failed on

Memo of P&A's In Support of Answer - No. C 07-5379 SBA

1  probation because he continued to associate with gang members.  RT at 781-82.  On parole,

2  petitioner ingested drugs one time.  RT at 784.

3

4  **Rebuttal Case**

5      By stipulation, the parties agreed that a Department of Corrections employee would

6  identify two taped recordings as telephone calls petitioner placed from jail to "Elizabeth" on April

7  9, 2002.  RT at 859.  Both tapes recordings were played for the jury.  RT at 860-61; CT 432-36.

8      Detective Joe Perez retrieved a pair of movie tickets from Stephanie Leon.  RT at 861-62.

9  By stipulation the jury was informed that the movie tickets were stamped as sold at 6:55 p.m.  RT

10  at 863.  Detective Perez drove from 1115 Mastic Street to the McDonald's restaurant in Hollister

11  and timed his trip.  RT at 893.  Perez began at 5:26 p.m. on a Friday and arrived at 6:27 p.m.  RT

12  at 893, 896.

13      Detective Michael Brown interviewed petitioner on April 9, 2002, following his arrest.

14  RT at 865-66.  Petitioner reported that he left San Jose for Hollister at 5:00 p.m.  RT at 867.

15  Petitioner did not report that he stopped to speak with his 12-year-old cousin, that he stopped at El

16  Rancho Liquors along the way, or that he stopped and  talked with a friend named "Chewy."  RT

17  at 867.

18      Verizon Wireless employee Barbara Reed identified records for the cell phone assigned

19  the number (408) 205-3914 and registered to Maria Gutierrez.  RT at 870.  The record shows a call

20  was received on April 5, 2002 at 4:44 p.m. and that a call, thereafter, originated from the cell phone

21  to (831) 636-4090 at 4:45 p.m.  RT at 871-72.  The cell phone then made a call at 6:17 p.m. to (831)

22  638-7560.  RT at 872.  The cell phone made a call to (831) 638-7560 at 6:22 p.m.  RT at 873.

23  Verizon does not charge for calls not completed.  RT at 877.  Records show that a 5:55 p.m. call was

24  made from a phone assigned the number (408) 947-8701 near Morgan Hill but was not completed.

25  RT at 878-79.  Records also show that a 6:16 p.m. call was made from a phone assigned the number

26  (408) 295-2038 from a Gilroy location but was not completed.  RT at 880-81.

27      Verizon Wireless engineer Russell Bentson testified that cell sites usually have ranges up

28  to a ten mile radius.  RT at 886, 889, 890.  The Morgan Hill cell site has a limited range to the east

1  and west, down to four miles, due to the surrounding hilly topography.  RT at 887.

2

3                                    **ARGUMENT**

4                                        **I.**

5            **THE RECORD DOES NOT DEMONSTRATE JUROR MISCONDUCT**

6            Petitioner asserts that the trial court denied him his right to an impartial jury under the

7  Sixth and Fourteenth Amendments when it denied his request to remove juror number eleven for

8  misconduct in failing to reveal that he knew a prosecution witness during voir dire.  *See* Petn. at 5.

9  Petitioner argues "[t]hat the juror identified specific persons in law enforcement that he knew but

10 singularly failed to include Officer Fonua smacks of dishonesty rather than mere inadvertence."  *See*

11 Petn. at 11

12      **A.    Factual Background**

13           The prosecutor named Officer Topui Fonua among 30 witnesses whom he intended to call

14 at trial.  CT at 380.  During voir dire, juror number eleven reported that he had no experiences with

15 police officers that would cause him lingering bias or prejudice.  *See* Respondent's Exhibit E at 14.

16 Juror number eleven affirmed that he would judge the testimony of a police officer by the "same

17 standards" one would apply to the testimony of any other witness.  *Id.*  Juror number eleven affirmed

18 that he would wait until after a police officer testified before deciding whether the officer was

19 credible or not.  *Id.*  Juror number eleven affirmed that he could keep an open mind until he heard

20 all the evidence and received instructions and that he would be a fair and impartial juror.  *Id.* at 17,

21 19, 20.  Juror number eleven reported that he knew some people in the District Attorney's Office

22 and in the Sheriff's Office.  *Id.* at 13.  He identified the elected District Attorney and three of his

23 deputies.  *Id.*  Juror number eleven also identified the elected Sheriff as the person he knew in that

24 office.  *Id.*

25            Mid-trial, before Officer Topui Fonua took the stand, the prosecutor informed the trial

26 court and defense counsel that Officer Fonua reported that he recognized juror number eleven.  RT

27 at 561-62.  Officer Fonua said, "Your Honor, it's my girlfriend's brother's brother-in-law.  His wife

28 is my girlfriend's brother's sister.  I always see him at Christmas, Thanksgiving, and that kind of

1    thing.  You see him at the table.  You talk to him."  RT at 562.

2         Trial counsel complained that Officer Fonua now enjoyed "added credibility."  RT at 562.

3    The trial court examined juror number eleven in the courtroom.  RT at 563.  The trial court

4    explained to juror number eleven that Officer Fonua reported knowing him "quite well."  RT at 563.

5    Juror number eleven said he did not recognize the name.  RT at 563.  When the trial court reported

6    that Officer Fonua was present in the courtroom, juror number eleven said, "He looks familiar, but

7    I'm not sure why."  RT at 563.  When the trial court asked if juror number eleven was aware of any

8    relationship with Officer Fonua, juror number eleven said, "Not that I'm aware of, but if my memory

9    were refreshed, it might help."  RT at 563.  The trial court instructed Officer Fonua to help the juror.

10   RT at 563.  Officer Fonua said, "Your wife's brother's sister, the get-together over the weekend."

11   RT at 563.  Juror number eleven responded, "Oh, of course.  I'm not used to seeing you in your

12   clothes.  I guess we're related, Your Honor."  RT at 563-64.

13        When the trial court asked juror number eleven whether the relationship would affect his

14   "ability to be fair and impartial in this case," juror number eleven said it would not.  RT at 564.

15   Juror number eleven answered "no" when the trial court asked if he would give Officer Fonua's

16   testimony "any more weight."  RT at 564.  Satisfied, the trial court instructed juror number eleven

17   to leave the courtroom.  RT at 564.

18        Outside juror number eleven's presence, trial counsel expressed concern that Officer

19   Fonua was juror number eleven's "relative" and that they had apparently socialized over the past

20   weekend.  RT at 565.  Trial counsel indicated that the case was a credibility contest and that the

21   prosecutor now had an advantage.  RT at 565.  Trial counsel asked that juror number eleven be

22   relieved or that the prosecutor limit Officer Fonua's testimony just to the circumstances of the photo

23   lineup shown to the minor, Eric.  RT at 565.

24        The trial court denied that motion.  RT at 566.

25
26   **B.    Court Of Appeal Findings**

27        The California Court of Appeal rejected the claim, finding as follows:

28        Under both the Sixth and Fourteenth Amendments to the United States Constitution

and Article I, section 16 of the California Constitution, a person "accused of a crime has a constitutional right to a trial by impartial jurors." (*In re Hitchings* (1993) 6 Cal.4th 97, 110.) Since adequate voir dire is a process essential to assuring that a criminal defendant receive a fair trial by impartial jurors (*ibid.*), "[a] juror who conceals relevant facts or gives false answers during the voir dire examination thus undermines the jury selection process and commits misconduct." (*Id.* at p. 111.)

Juror misconduct based upon concealment or the giving of false answers during voir dire does not automatically result in prejudice. "As a general rule, juror misconduct 'raises a presumption of prejudice that may be rebutted by proof that no prejudice actually resulted.' [Citations.]" (*In re Hitchings, supra,* 6 Cal.4th at p. 118.) The presumption of prejudice thus may be rebutted either through " ' "an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct." ' " (*Id.* at p. 119, internal brackets omitted .)

Here, there was no evidence of juror misconduct. While it is true that Juror Number 11 did not mention his acquaintance with Officer Fonua during voir dire, there is nothing in the record indicating that the juror concealed this fact or gave any false answers. Juror Number 11 did not recognize Officer Fonua by name and, initially, did not even recognize the witness when he saw him in court. There is no evidence that the juror feigned ignorance in this regard. Further, there is no indication that the juror, at the time of voir dire, knew that the person he occasionally saw at gatherings-whom he knew as the boyfriend of the juror's wife's sister-was a peace officer. Therefore, from the record before us, Juror Number 11 did not conceal any information or give any false answers during voir dire.

Citing *People v. McNeal* (1979) 90 Cal.App.3d 830 (*McNeal*), defendant contends that the court's inquiry here was only "cursory." But in McNeal, the trial court was placed on notice at the end of trial that a juror had personal knowledge of facts having a potential bearing on her ability to decide the case fairly, including a statement (made to the foreman) that " 'she had too much to lose, and it [information known to her] would definitely affect her decision now.' " (*Id.* at p. 836.) The *McNeal* court concluded that the trial court did not satisfy the requirements of section 1120, in that it failed to conduct "at least a minimal factual inquiry [that] left unresolved the essential question: [the juror's] ability to deliberate impartially." (*People v. McNeal, supra,* at p. 839.)

The circumstances in *McNeal* are very different than those before us. There, the court was faced with substantial evidence that a juror had information that might have affected her ability to be impartial, and it failed to make a factual inquiry of that juror. Here, there was little indication that Juror Number 11 could not be impartial, and, in any event, the trial court made sufficient inquiry of that juror to determine that his relationship with Officer Fonua would not affect his ability to be impartial. We therefore reject defendant's assertion that the court failed to conduct a sufficient inquiry to determine potential bias on the part of Juror Number 11.

Since there is no evidence of juror misconduct, we need not reach the question of prejudice. But even were we to find juror misconduct-in the form of Juror Number 11's nondisclosure during voir dire of his acquaintance with Officer Fonua-we would find no prejudice. Here, there was " ' "an affirmative evidentiary showing that prejudice d[id] not exist." ' " (*In re Hitchings, supra,* 6 Cal.4th at p. 119.) "[A]n honest mistake on voir dire cannot disturb a judgment in the absence of proof that the juror's wrong or incomplete answer hid the juror's actual bias. Moreover, the juror's good faith when answering voir dire questions is the most significant indicator that there was no bias." (*In re Hamilton* (1999) 20 Cal.4th 273, 300.) The record discloses no such bias with respect to Juror

Number 11, and we thus reject defendant's claim of error as unfounded, both because there was no misconduct and because, even were there some showing of misconduct, there was no resulting prejudice.

*See* Respondent's Exhibit B at 19-22 (footnotes omitted).

### C.    No Misconduct Demonstrated

Because petitioner alleges juror bias, he "must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).

Here, the state courts analyzed whether the juror had lied or knowingly misled the court. Accordingly, the state courts' disposition is not "contrary" to established Supreme Court precedent. Nor is the state courts' decision an unreasonable application of clearly established federal law. The record does not establish that the juror intentionally failed to answer honestly a question on *voir dire*. Absent that showing, no relief is warrant under *McDonough*.

Further, the state courts' factual findings are presumed to be correct, and may be disturbed only if they are not fairly supported by the record, or are rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *Patton v. Yount*, 467 U.S. 1025, 1038 (1984) (state court's finding of no juror bias is factual finding entitled to presumption of correctness). Here, the court of appeal found that there was no evidence that juror number eleven concealed any information or gave any false answers during voir dire. Petitioner has presented no clear and convincing evidence to the contrary.

## II.

## THERE WAS NO VIOLATION OF *CRAWFORD V. WASHINGTON*

Petitioner asserts that admission of hearsay from a criminal street gang expert violated his Sixth and Fourteenth Amendment rights to confront and cross-examine witnesses against him, citing *Crawford v. Washington*, 541 U.S. 36 (2004). *See* Petn. at 13.

The California Court of Appeal rejected the claim as follows:

Defendant argues that admission of testimony by Officer Nieves violated defendant's right to confront witnesses guaranteed by the United States and California Constitutions.

He asserts that application of *Crawford, supra,* 541 U.S. 36, compels this conclusion because the expert's testimony was based in part upon hearsay statements obtained from others. Based on our review of *Crawford,* coupled with our reliance on the recent case of *People v. Thomas* (2005) 130 Cal.App.4th 1202 (*Thomas*), we reject defendant's argument.

At the outset, we address the Attorney General's assertion that defendant waived-or, more precisely, forfeited-this claim of error by failing to raise it at the time the prosecution sought to introduce the evidence. Defendant was tried and convicted in November 2003, over three months before *Crawford* was decided. Under these circumstances, we decline to hold that defendant forfeited this challenge. (See *Thomas, supra,* 130 Cal.App.4th at p. 1208 [failure to object that gang expert's reliance on hearsay violated right to confront witnesses excusable, since *Crawford* decided after the defendant's trial]; see also *People v. Butler* (2005) 127 Cal.App.4th 49, 54, fn. 1 [same]; *People v. Johnson* (2004) 121 Cal.App.4th 1409, 1411, fn. 2 [same].)

In *Crawford, supra,* 541 U.S. 36, the Supreme Court considered the admissibility at trial of a tape-recorded statement made by the defendant's wife to the police. (*Id.* at p. 38.) The witness did not testify at trial because of a state statute barring a spouse from testifying absent the other spouse's consent. (*Id.* at p. 40.) The defendant argued that admission of his wife's out-of-court statement violated his federal constitutional right under the Sixth Amendment to confront witnesses offering testimony against him. (*Ibid.*) The Supreme Court agreed; it held that, in keeping with the understanding of the Framers of our nation's Constitution, "[t]estimonial statements of witnesses absent from trial [may be] admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." (*Id.* at p. 59, fn. omitted.)

The two-prong *Crawford* test of witness unavailability and prior opportunity to cross-examine applies only to statements that are "testimonial." As to nontestimonial hearsay, the Supreme Court observed that "it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law" because such statements are "exempted . . . from Confrontation Clause scrutiny altogether." (*Crawford, supra,* 541 U.S. at p. 68.)

The *Crawford* court declined to "spell out a comprehensive definition of 'testimonial.' " (*Crawford, supra,* 541 U.S. at p. 68, fn. omitted.) It, however, explained that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." (*Ibid.*)

In *Thomas, supra,* 130 Cal.App.4th 1202, 1208, the defendant made the argument identical to the one made by defendant here: that he was deprived of his right to confront witnesses under *Crawford* when the prosecution admitted "hearsay evidence in the form of the gang expert's conversations with other gang members in which they identified [the] defendant as a gang member." The appellate court rejected this argument, concluding that the hearsay statements were merely used as one of the bases for the gang expert's opinion and were nontestimonial. (*Id.* at p. 1210.)

The *Thomas* court acknowledged the established rule permitting experts to identify the information and sources on which they base their opinions, and that such sources may include hearsay. (*Thomas, supra,* 130 Cal.App.4th at pp. 1209-1210.) It noted further that such opinions may be founded on various matters, irrespective of whether they are themselves admissible. (*Ibid.*; see also Evid.Code, § 801, subd. (b) [expert's opinion may be based on matter "whether or not admissible, that is of a type that reasonably may be

relied upon by an expert in forming an opinion upon the subject to which his testimony relates"].)  The court reasoned: "*Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions.  This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion." (*Thomas, supra,* at p. 1210.)

We agree with the court's analysis and conclusion in *Thomas, supra,* 130 Cal.App.4th 1202.  The Supreme Court noted in *Crawford* that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (*Crawford, supra,* 541 U.S. at p. 59-60, fn. 9; see also *Thomas, supra,* at p. 1210; *People v. Saffold* (2005) 127 Cal.App.4th 979, 984.)  Although defendant here does not specify the particular objectionable hearsay on which Officer Nieves relied, it is plain that any such statements upon which Nieves relied in forming his opinions were not offered for the truth of their contents.  Rather, they were simply offered as one or more of the bases for Officer Nieves's opinions.  They were therefore not "hearsay evidence" subject to potential exclusion under Evidence Code section 1200. (See, e.g., *People v. Mayfield* (1997) 14 Cal.4th 668, 741.)

The hearsay statements identified by Officer Nieves were nontestimonial, were not offered for their truth, were not "hearsay evidence" under Evidence Code section 1200, subdivision (a), and were properly admitted under California law.  As such, their admission did not violate defendant's constitutional right to confront witnesses under *Crawford*.

*See* Respondent's Exhibit B at 33-37 (footnotes omitted).

Petitioner does not demonstrate that *Crawford v. Washington*, 541 U.S. 36, barred the gang expert from testifying about his opinion based in part on interviews with others.  The Sixth Amendment does not bar out-of-court statements when the statement is not offered to prove the truth of the matter asserted.  *United States v. James*, 487 F.3d 518, 525 (7th Cir. 2007).  When out-of-court statements are not offered to prove the truth of the matter asserted, the Confrontation Clause is satisfied if the defendant had the opportunity to cross-examine the person repeating the out-of-court statement.  *See Tennessee v. Street*, 471 U.S. 409, 414 (1985).  Thus, the state courts' denial of the claim was not contrary to, or an unreasonable application of *Crawford v. Washington*, nor was it objectively unreasonable.

### III.

### PETITIONER DOSE NOT DEMONSTRATE ACTUAL INNOCENCE

Petitioner presents a declaration from the victim who recants his trial testimony.  Petitioner produced that declaration in support of a state habeas petition presented to the California Supreme

1   Court.  *See* Respondent's Exhibit D.  Petitioner asserts that the state courts denied him his Fifth and

2   Fourteenth Amendment rights by refusing to reverse the judgment on the basis of this declaration

3   demonstrating his innocence.  *See* Petn. at 5, 15-17.

4          In *Herrera v. Collins*, 506 U.S. 390, 400 (1993), a capital case, the Supreme Court held,

5   "Claims of actual innocence based on newly discovered evidence have never been held to state a

6   ground for federal habeas relief absent an independent constitutional violation occurring in the

7   underlying state criminal proceeding."  This is because federal habeas courts sit to ensure that

8   individuals are not imprisoned in violation of the Constitution, not to correct errors of fact.  *Id*.

9   "Few rulings would be more disruptive of our federal system than to provide for federal habeas

10  review of freestanding claims of actual innocence."  *Id*. at 401.

11         The Court did assume for the sake of argument that "*in a capital case* a truly persuasive

12  demonstration of 'actual innocence' made after trial would render *the execution* of a defendant

13  unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such

14  a claim."  *Id*. at 417 (emphasis added).  Five concurring and dissenting justices would have explicitly

15  held that a defendant who makes a sufficient showing of actual innocence cannot be executed.  *Id*.

16  at 419, 431.  However, no justice suggested that federal habeas review of a freestanding innocence

17  claim would ever be available in a non-capital case.  *See Schlup v. Delo*, 513 U.S. 298, 316 (1995)

18  (describing *Herrera* as allowing possibility of federal habeas relief where evidence of innocence was

19  strong enough to make defendant's *execution* constitutionally intolerable).

20         In *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997) (en banc), a capital case, the

21  Ninth Circuit found that a freestanding claim of actual innocence was cognizable based on the fact

22  that five of the justices in *Herrera* would have held that "execution of an innocent person would

23  violate the Constituion."  *Carriger* at 476.  However, in *Coley v. Gonzales,* 55 F.3d 1385, 1387 (9th

24  Cir. 1995), the Ninth Circuit rejected the notion that a freestanding claim of actual innocence is

25  reviewable in a non-capital case.

26         As the above authorities make clear, there is no clearly established Supreme Court law that

27  would permit this Court to entertain petitioner's actual innocence claim.  In the absence of such

28  authority, the Court cannot reach the claim.  *See Carey v. Musladin*, 127 S.Ct. 649, 653 (2006).

Memo of P&A's In Support of Answer - No. C 07-5379 SBA

1    Even if the claim were cognizable, petitioner has failed to make a sufficient showing to

2    warrant habeas relief.  In *Herrera*, the Court did not specify what showing would be required to

3    establish actual innocence; it stated only that the threshold would be "extraordinarily high," and the

4    evidence would have to be "truly persuasive." 504 U.S. at 417.  In *Carriger*, the Ninth Circuit found

5    that a petitioner "must go beyond demonstrating doubt about his guilt, and must affirmatively prove

6    he is probably innocent." *Carriger*, 132 F.3d at 476.  In making this assessment, the court "may

7    consider how the timing of the submission and the likely credibility of the affiants bear on the

8    probable reliability of that evidence." *Schlup*, 513 U.S. at 332.  The type of persuasive evidence of

9    innocence includes "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical

10   physical evidence." *Id.* at 324.  "[T]he new evidence is not simply taken at face value." *House* v.

11   *Bell*, 126 S. Ct. 2064, 2088 (2006) (Roberts, C.J., concurring and dissenting); *see Smith v. Baldwin*,

12   2007 U.S. App. LEXIS 29743, *23, 36-37 (9th Cir. 2007) (en banc).

13   The declaration from Raymond Rodriguez is the only evidence presented to support

14   petitioner's claim of actual innocence. *See* Petn. Exh. B.  Rodriguez testified at trial that petitioner

15   was the driver of the truck who raised a gun and shot Rodriguez. RT at 107, 112, 116.  Rodriguez

16   testified that he identified petitioner's photograph from a lineup. RT at 129. San Jose Police Officer

17   Joe Perez corroborated the fact that the victim identified petitioner's photograph from a lineup.  RT

18   at 397, 400.

19   On May 6, 2005, Raymond Rodriguez signed a declaration under penalty of perjury which

20   claimed, in part:

21       13.  I am not positive that Mr. Rubalcava was the person who shot me.

22       14.  I testified at trial that Mr. Rubalcava was the person who shot me.  The only
        reason I testified to this was because Mr. Rubalcava <u>looks like the person who</u>
23          <u>shot me</u>.  Second, I was told by Detective Perez [investigating detective] that
        there were other facts not known to me that existed, that made Mr. Rubalcava
24      the shooter, and therefore made me believe that Mr. Rubalcava was the right
        person.
25
26       15.  I realize now, that I did not tell the truth at trial.

27   *See* Petn. Exhibit B.

28   Courts have consistently found that a recantation of trial testimony by a witness is

1  inherently unreliable. *See Dobbert v. Wainwright*, 468 U.S. 1231, 1233 (1984) (Brennan, J.,

2  dissenting from denial of cert.) ("Recantation testimony is properly viewed with great suspicion");

3  *Allen v. Woodford*, 395 F.3d 979, 994 (9th Cir.), *cert. denied* 126 S.Ct. 134 (2005); *Carriger*, 132

4  F.3d at 483 (*en banc*) (Kozinski, J., dissenting) ("Recanting testimony has long been disfavored as

5  the basis for a claim of innocence. Appellate courts, even on direct review, look upon recantation

6  with extreme suspicion"); *In re Weber*, 11 Cal.3d 703, 724 (1974) ("The offer of a witness, after the

7  trial, to recant his sworn testimony is always looked upon with suspicion.").

8       Here, Raymond Rodriguez's declaration, obtained without the benefit of cross-

9  examination and an opportunity to make a credibility determination, is inherently suspect and does

10  not provide sufficient support for petitioner's actual innocence claim. The declaration was drafted

11  two years after petitioner's trial. Petitioner has given no explanation for this delay. Further, the

12  declaration from Rodriguez is not conclusive. The declaration is not convincing evidence that

13  Rodriguez's trial testimony was false or that petitioner did not shoot Rodriguez. Further, other

14  percipient witnesses identified petitioner as the shooter. The victim's brother, Eric, testified that

15  petitioner pulled out a black gun with his left hand and shot once at Rodriguez. RT at 170-73. Eric

16  identified petitioner's photograph from a lineup. RT at 178. Nicholas Faria told investigating police

17  officer David Garcia that the driver of the truck pointed a black semiautomatic handgun out the

18  window and shot the victim from ten feet away. RT at 282. David Gonzalez, Jr., testified that he

19  told police that the shooter and the driver of the truck were Lionel Rubalcava who lived on Palm

20  Street. RT at 486. Gonzalez identified petitioner's photograph from a lineup. RT at 489, 552, 577.

21  Investigating officer Spillman corroborated the fact that David Gonzalez eventually reported

22  petitioner's name as the shooter. RT at 550.

23       The record demonstrates that the Rodriguez's declaration does not demonstrate

24  convincingly that petitioner is more likely than not factually innocent of the shooting of Raymond

25  Rodriguez, nor is the declaration of such probative value that it would probably have resulted in his

26  acquittal if introduced at trial. Therefore, petitioner has not demonstrated that the state courts'

27  denial of the claim was not contrary to, or an unreasonable application of Supreme Court precedent,

28  nor was it objectively unreasonable.

1

**CONCLUSION**

2      Accordingly, respondent respectfully requests that the Court deny the petition for writ of

3  habeas corpus.

4      Dated:  January 7, 2008

5                   Respectfully submitted,

6                   EDMUND G. BROWN JR.
                 Attorney General of the State of California

7                   DANE R. GILLETTE
                 Chief Assistant Attorney General

8
                 GERALD A. ENGLER

9                   Senior Assistant Attorney General

                 PEGGY S. RUFFRA

10                   Supervising Deputy Attorney General

11

12                   **/s/ Rene A. Chacon**

13                   RENE A. CHACON
                 Supervising Deputy Attorney General

14                   Attorneys for Respondent

15  40202856.wpd
    SF2007403116

16

17

18

19

20

21

22

23

24

25

26

27

28

Memo of P&A's In Support of Answer - No. C 07-5379 SBA