1   Allen H. Schwartz, SBN 108126
    Attorney at Law
2   111 W. St. John Street, Suite 555
    San Jose, CA  95113
3   Tel:  (408) 298-9494
    Fax: (408) 298-4551
4

5   Attorney for Defendant LIONEL RUBALCAVA

6

7

8               IN THE UNITED STATES DISTRICT  COURT

9           FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                      OAKLAND DIVISION

11

12

13

14   LIONEL RUBALCAVA,                    Case No.  C 07-5379 SBA

15                     Petitioner,

16        v.                             PETITIONER'S TRAVERSE IN
                                         SUPPORT OF PETITION FOR
17   TOM FELKER, Warden,                 WRIT OF HABEAS CORPUS

18                     Respondent.

19

20        TO THE HONORABLE SAUNDRA BROWN ARMSTRONG:

21        Pursuant to 28 U.S.C. section 2254, petitioner respectfully submits his

22   traverse in support of his petition for writ of habeas corpus.

23   Dated: February 5, 2008                 Respectfully submitted,

24

25                                      _____
                                             Allen H. Schwartz
26                                        Attorney for Petitioner
                                            Lionel Rubalcava
27

28                                      1

1

2

3                                   TABLE OF CONTENTS

4    TABLE OF AUTHORITIES                                              3

5    STATEMENT OF FACTS                                               4

6    ARGUMENT                                                         8

7        I.  THE EVIDENCE DOES NOT SUPPORT THE VERDICT;
         THE DENIAL BY THE STATE COURT OF PETITIONER'S
8        CLAIM OF ACTUAL INNOCENCE IS AN "OBJECTIVELY
         UNREASONABLE" APPLICATION OF CLEARLY
9        ESTABLISHED FEDERAL LAW.                                     8

10       II. THE *CRAWFORD* DECISION AND THE CONFRONTATION
         CLAUSE BAR THE GANG EXPERT FROM OFFERING
11       HEARSAY STATEMENTS AS A BASIS FOR HIS OPINION
         THAT THE SHOOTING WAS DONE FOR THE BENEFIT OF
12        A CRIMINAL STREET GANG.                                     11

13       III. PETITIONER WAS DENIED HIS RIGHT TO A TRIAL BY
         IMPARTIAL JURORS WHEN JUROR NUMBER 11 FAILED
14       TO DISCLOSE HIS RELATIONSHIP WITH A PROSECUTION
         WITNESS.                                                     16

15    CONCLUSION                                                      19

16

17

18

19

20

21

22

23

24

25

26

27

28    Traverse in Support of Petition for
      Writ of Habeas Corpus                    2                     No.  C 07-5379 SBA

1

## TABLE OF AUTHORITIES

2

<u>Cases</u>

3     *Stovall v. Denno* (1967) 388 U.S. 293                                           10

4     *Neil v. Biggers*, (1972) 409 U.S. 188                                          10

5     *United States v. Havens* (1980) 446 U.S. 620                                   11

6     *Napue v. Illinois* (1959) 360 U.S. 264                                         11

7     *Wiggins v. Smith,* 539 U.S. 510                                          11, 15, 19

8     *Pointer v. Texas* (1965) 380 U.S. 400                                          11

9     *Crawford v. Washington* (2004) 541 U.S. 36                                11, 12, 13, 14

10    *United States v. Bohie*, (9th Cir. 1971) 445 F.2d 54                           13

11    *United States v. Williams*, 447 F.2d 1285 (5th Cir. 1971) (en banc),
      cert. denied 405 U.S. 954 (1972)                                               13

12

13    *Jenkins v. United States,* 113 U.S.App.D.C. 300,
       307 F.2d 637 (1962) (en banc)                                                 13

14    *State Highway Comm. v.Oswalt,* (1970) 463 P.2d 602                             13

15    *United States v. Sims* (9th Cir. 1975) 514 F.2d 147                            13

16    *People v. Thomas*, (2005) 130 Cal.App.4th 1202                                 13

17    *United States v. Ordonez*, (9th Cir. 1984) 737 F.2d 793                        14

18    *Arizona v. Fulminante* (1991) 499 U.S. 279                                     15

19    *Chapman v.California* (1967) 386 U.S. 18                                       15

20    *In re Hitchings* (1993) 6 Cal.4th 97                                           16

21    *In re Hamilton* (1999) 20 Cal.4th 273                                          16

22    <u>Statutes & Other Authorities</u>

23    28 U.S.C. section 2254                                                          1

24    United States Constitution

25        Sixth Amendment                                                     13, 14, 15, 16

26        Fourteenth Amendment                                                    15, 16

27

28    Traverse in Support of Petition for
      Writ of Habeas Corpus                          3                     No.  C 07-5379 SBA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STATEMENT OF FACTS

*Prosecution Evidence*

Raymond Rodriguez was shot on April 5, 2002, after coming home from the movies with his family. (RT 78, 106-107)[1].  Rodriquez was a member of the Varrio East Side Norteno (VEN) gang while living at his previous address. (RT 81-82). After he moved to Mastic Street, in West Side Mob gang territory, he continued to hang out with VEN. (RT 88).

On the day of the shooting, Rodriguez came back from the movies and went to visit his next door neighbor, David Gonzalez, Jr. (RT 95).   Rodriguez and his brother Eric, as well as other friends including Daniel Cerecerez, were visiting on the front lawn when Rodriguez saw a blue SUV driving slowly down the Street. (RT 96-97).   Rodriguez asked his neighbor who was in the car and Gonzalez responded that is was someone who was "tripping" all day. (RT 99).   The car made a U-turn and Rodriguez went to the curb. (RT 100, 102).  The truck stopped in  front of Rodriguez's house. (RT 102-103).   At first Rodriguez thought the driver was his friend Chris, but then realized it was not. (RT 142).

Rodriguez raised his hands and said, "What's up?" (RT 107).  From a range of 12 to 25 feet, the driver shot Rodriguez. (RT 114-115).   At the trial Rodriguez identified petitioner as the driver. (RT  I15, 116).

Rodriguez suffered paralysis from the waist down. (RT 126). He also suffered from memory loss as a result of the shooting. (RT 140).   At trial, Rodriguez did not remember talking to the police officers the night after the shooting or the day after that. (RT 125).   He did remember that Detective Joe Perez showed him a photographic lineup, but he could not identify anyone. (RT 129).   Sometime later he

_____

[1] RT refers to the Reporter's Transcript of the trial.  These transcripts have been lodged as exhibits with the court. (Respondent's Exhibit F.)

Traverse in Support of Petition for
Writ of Habeas Corpus                              4                         No.  C 07-5379 SBA

1    was shown a lineup and circled a picture of the person whom he believed shot him.

2    (RT 129). Rodriguez continually gave inconsistent descriptions of the shooter. (RT

3    130, 133, 134).

4        Rodriguez's younger brother, Eric, testified that the car driving slowly down

5    the Street was a green Toyota. (RT 162).   He stood next to Rodriguez's left shoulder

6    when the car came to a stop. (RT 165).   He saw four people in the car, two in the

7    front and two in the back. (RT 166).   The driver spoke to Rodriguez but Eric could not

8    hear what he said. (RT 166-167).   Eric had never heard of Lionel Rubalcava before,

9    but identified him in court as the shooter. (RT 171-172).

10       Police officers Fonua and Spillman showed Eric a photographic lineup with

11   petitioner's picture first in the series. (RT 176, 178).  He identified petitioner in the

12   lineup, (RT 178) but gave differing descriptions of the shooter.  On April 5, 2002, he

13   said the shooter was a Hispanic male with black shaved hair, a thin moustache, and

14   a white shirt; the next day he said the man had a buzz haircut and no facial hair. (RT

15   183).   At the preliminary hearing he said the man wore a white t-shirt and had a

16   moustache and hair on his chin but at the trial could not remember if the shooter had

17   facial hair. (RT 184).

18       Two days after the shooting the victim's sister, Jennifer, saw a light

19   colored truck drive up. (RT 213-214).   The two male occupants called her over. (RT

20   215).  The driver was handling something dark in color. (RT 216).  Jennifer refused

21   to go over to the truck. (RT 216).  She identified petitioner as the driver of the truck

22   that day. (RT223).

23       On the day of the shooting Nicholas Faria was visiting David Gonzalez on his

24   front lawn. (RT 258).   He told police that a Toyota 4Runner drove up close to the

25   Rodriguez house, slowed down and then stopped. (RT 261).   Faria described the

26   driver as a Hispanic male, 17 to 24 years old, with a shaved head. (RT 282).  When

27

28   Traverse in Support of Petition for
     Write of Habeas Corpus              5              No.  C 07-5379 SBA

1    the victim was about 10 feet from the driver, the driver pointed a black handgun at

2    the victim and shot him. (RT 283).

3         Daniel Cerecerez described petitioner as a friend and neighbor. (RT 286-287).

4    He had ridden in petitioner's black pickup truck. (RT 288).   Cerecerez used to be in

5    the Varrio Horseshoe gang and the West Side Mob (WSM). (RT 292) He identified

6    petitioner as a member of the West Side gang. (RT 293). Cerecerez was also friends

7    with Rodriguez, and identified him as a Norteno gang member. (RT 301, 303).

8         On the day of the shooting, Cerecerez saw a black truck pull up. (RT 316). He

9    made eye contact with the front passenger in the truck but then looked away. (RT

10   346).   He described the right front passenger as a Hispanic man in a tank top but

11   did not get a good look at the others in the truck because it was too dark inside of

12   it. (RT 324).   He did not recognize anyone in the truck. (RT 348).  Cerecerez heard

13   David Gonzalez Jr. say "go in the house" right before the shooting. (RT 325).  He

14   then heard a gunshot and ducked. (RT 322-323).

15        David Gonzalez. Jr. testified that he is an associate member of the Varrios

16   Horseshoe Norteno gang. (RT 430).  Before the shooting he was aware of tension

17   between Varrios Horseshoe and West Side Mob members. (RT 447).  On the day

18   of the shooting, he made eye contact with the driver of the green Explorer truck and

19   claimed he recognized him. (RT 461, 458-459).  Gonzalez warned his friends to get

20   off the street. (RT 470).  From the side of his home he heard one gun shot. (RT 474).

21   Two days later he saw a black pickup truck drive by his home. (RT 481).  He later

22   told police that the driver of the truck was petitioner who lived on Palm Street. (RT

23   486). He offered to lead police to the place where he had seen the black pickup truck

24   parked before. (RT 546).  Gonzalez led them to a truck that was "very similar" to the

25   truck petitioner drove. (RT 547).

26   / / /

27

28   Traverse in Support of Petition for
     Writ of Habeas Corpus              6              No.  C 07-5379 SBA

1    *Gang Evidence*

2         Officer Rafael Nieves described the West Side Mob (WSM) as a formal

3    street gang in existence since the 1990's. (RT 589-90).   Two of its members were

4    recently prosecuted for gang-related homicide. (RT 59-60).  The gang is affiliated

5    with the Norteno Street gang; they wear red and identify with the number 14.  (RT

6    591).

7         Nieves testified that petitioner is a member of WSM. (RT 597).  He produced a

8    picture of petitioner with several West Side gang members. (RT 596-597).   Nieves

9    also produced several field interview cards and investigation notes as evidence of

10   petitioner's affliation. (RT 5 97-600).  He presented a seized letter written by

11   petitioner in jail to another inmate with his signature as a WSM member. (RT 602).

12        The Varrio Horseshoe gang is also affiliated with the Norteno street gang,

13   adopts the color red and the number 14. (RT 63).   In April, 2002, Nieves learned

14   that a conflict existed between WSM and the Varrio Horseshoe gang members. (RT

15   64).   A Varrio Horseshoe graffiti "tag" was defaced by a WSM "tag." (RT 64).  Also,

16   anger resulted from WSM members visiting a park in Varrio Horseshoe territory. (RT

17   65).   WSM members apparently told Nieves that Varrios Horseshoe members had

18   disrespected a girlfriend of a West Side member. (RT 65).  Finally, both gangs

19   competed for low-level narcotics territory. (RT 65-66).

20   *Petitioner's Defense*

21        Petitioner presented an alibi defense. At the time of the shooting he was

22   getting ready for a date. (RT 750).  He checked the arrangements with his date,

23   Stephanie, by phone at 4:30 pm and left his home about 4:45pm to drive to Hollister

24   to meet her. (RT 756).  He wore black slacks and a black dress shirt. (RT 756).  He

25   drove to Hollister on the Monterrey Highway, taking more than an hour to get there

26   because of a stop to greet a cousin and buy a burrito; he arrived between 6:20 and

27

28   Traverse in Support of Petition for
     Writ of Habeas Corpus                    7                    No.  C 07-5379 SBA

6:35pm. (RT 845-849).   He met Stephanie and they went to the movies arriving in time for the 7:00 pm show. (RT 658).

Two days after the shooting, petitioner drove down Mastic Street with a friend named Peter. (RT 766).  He stopped the truck to say hello to a cute girl. (RT 766). The victim's sister, Jennifer, told petitioner about the shooting of her brother and the information surprised petitioner. (RT 830-831).

Petitioner denied being a current member of a gang; he considered himself "separated" from the West Side gang. (RT 722).   He admitted writing the letter to another inmate in jail but only aligned himself with the gang in jail to gain protection. (RT 727).

*Rebuttal Evidence*

Petitioner's date, Stephanie, produced the tickets from the movie that she saw with petitioner the night of the shooting; they were purchased at 6:55 pm. (RT 863). Taking a different route than petitioner testified to, Detective Perez drove from Mastic Street to the meeting place in Hollister in one hour and one minute. (RT 893, 896). He stopped at petitioner's house for 30 seconds. (RT 893, 896).

### ARGUMENT

I.  THE EVIDENCE DOES NOT SUPPORT THE VERDICT;
THE DENIAL BY THE STATE COURT OF PETITIONER'S CLAIM
OF ACTUAL INNOCENCE IS AN "OBJECTIVELY UNREASONABLE"
APPLICATION OF CLEARLY ESTABLISHED  FEDERAL LAW.

Rodriguez's identification of petitioner was a mistaken identification.  At trial it was  equivocal at best.  Now, with time to reflect, Rodriguez recants his trial testimony and declares under penalty of perjury that he "did not tell the truth at trial". (Pet. Ex. B, ¶ 15.)   Initially, he thought the driver of the vehicle was one of his friends. (RT 142, 143).   After the shooting he suffered memory loss and at trial he did not remember his hospital stay clearly, or talking to the police, but did remember

1    that he did not identify anyone from the initial photographic lineup. (RT129-140).  His

2    various descriptions of the shooter were inconsistent at best. (RT 130,132).

3        Respondent makes too much of Rodriguez's identification of petitioner. Further,

4    his little brother, Eric, is no more credible, since his identification was obviously

5    coached and influenced by his sister. (RT 189).  If it was not coached and influenced

6    by her presence then again no rational jury would resolve the conflict in his testimony

7    in the People's favor: he could not remember from one minute to the next who was

8    with him when he viewed the lineups. (RT 198).

9        While respondent would like these identifications to be sufficient to support

10   the verdict, they are simply not reliable or credible such that a reasonable, rational

11   jury would believe them. It is rather more likely that, even if the other errors he

12   alleges were discounted, petitioner was convicted because he drove by the house

13   on Sunday, lied to his date about his identity, and because the victim was seriously

14   and obviously injured. While a juror would be moved by the victim's suffering and

15   might dislike petitioner, a juror is not permitted to convict a defendant in a criminal

16   case based on either sympathy or antipathy. Given the manifestly contradictory

17   eyewitness evidence and the complete absence of any other evidence, it is clear that

18   this jury convicted from passion, in disregard of its instructions. (CT 422.).

19        As will be seen below in the discussion of victim's recanting declaration, the

20   victim declares that the identification of petitioner from the photo line-up he first

21   viewed at hospital was unduly suggestive, making that and any subsequent

22   identification highly suspect.

23        *Victim's Recantation*

24        Victim Raymond Rodriguez signed a declaration under penalty of perjury

25   recanting his trial testimony in which he identified petitioner as the person who shot

26   him.  (Pet. Ex. B).  He was in hospital and heavily medicated when he was shown the

27

28

1  photo line-up containing petitioner's image.  Mr. Rodriguez states that he only told
2  police that petitioner looked like the person that shot him, but that he testified falsely
3  at trial because police had alluded to facts supposedly known only to them that
4  petitioner was the actual shooter.  Mr. Rodriguez has reflected on what he has done
5  and now wants to do the right thing.  He declares that the only time he ever saw
6  petitioner was in court.  He is concerned about the whole identification process and
7  is troubled by the injustice he has done to petitioner.  He now very much wants to
8  help police in finding the person who actually shot him.  His declaration was given
9  freely and voluntarily and was not prompted by any promises or threats.

10  Respondent attempts to dismiss the declaration of victim Rodriguez by
11  claiming that recantations are generally suspect, and that a declaration cannot be
12  cross-examined and tested for credibility.  (Resp. 19-20.)  True, victim's declaration
13  cannot be cross-examined, but this is petitioner's offer of direct evidence of his
14  actual innocence.  He welcomes and respectfully requests an evidentiary hearing so
15  that both victim and other witnesses can be examined in open court and petitioner's
16  actual innocence can be established.

17  "A conviction which rests on a mistaken identification is a gross miscarriage
18  of justice." (*Stovall v. Denno* (1967) 388 U.S. 293, 297; 87 S.Ct. 1967; 18 L.Ed.2d
19  1199.)  Procedures by which the defendant is identified as the perpetrator therefore
20  must be examined to assess whether they are unduly suggestive. "It is the
21  likelihood of misidentification which violates a defendant's right to due process."
22  (*Neil v. Biggers*, (1972) 409 U.S. 188, 198; 93 S.Ct. 375; 34 L.Ed.2d 401.)  Due
23  process protects against the admission of evidence deriving from suggestive
24  identification procedures. (*Id*. at 196).  Unnecessarily suggestive identification
25  procedures alone do not require exclusion of in-court identification testimony,
26  however; reliability is the linchpin in determining the admissibility of identification
27
28  Traverse in Support of Petition for
    Writ of Habeas Corpus              10              No.  C 07-5379 SBA

1    testimony. (*Id*. at 114, 97 S.Ct. 2243).

2         The victim certifies that he gave false evidence at trial when he misidentified

3    petitioner. Petitioner was then prejudiced by the state court's denial of his petition for

4    writ of habeas corpus.  The state court should not have allowed false testimony to go

5    unchallenged as it impairs the integrity of the factfinding objective of a trial.  (*United*

6    *States v. Havens* (1980) 446 U.S. 620, 627.)  If the criminal judgment was obtained

7    through the use of false evidence, petitioner's due process rights have been violated.

8    (*Napue v. Illinois* (1959) 360 U.S. 264, 269.)  That denial of the state court petition

9    was an "objectively unreasonable" application of Sixth Amendment law. (*Wiggins v.*

10   *Smith,* 539 U.S.510; state court judgment was "objectively unreasonable" insofar as

11   a claim of actual innocence was rejected without a hearing.)

12

13        II. THE *CRAWFORD* DECISION AND THE CONFRONTATION CLAUSE
          BAR THE GANG EXPERT FROM OFFERING HEARSAY STATEMENTS
          AS A BASIS FOR HIS OPINION THAT THE SHOOTING WAS DONE FOR
14        THE BENEFIT OF A CRIMINAL STREET GANG.

15        The Sixth Amendment's Confrontation Clause provides that in all criminal

16   prosecutions, the accused shall enjoy the right to be confronted with the witnesses

17   against him and applies to state as well as federal prosecutions. (*Pointer v. Texas*

18   (1965) 380 U.S. 400, 406).  The Confrontation Clause bars the prosecution from

19   usjng testimonial hearsay against a criminal defendant unless the declarant testifies

20   at trial, or, if the declarant was unavailable to testify, and the defendant had a

21   previous opportunity for cross-examination. (*Crawford v. Washington* (2004) 541

22   U.S. 36, 124 S.Ct. 1354, 1363-1367.) The fact that an out-of-court statement may be

23   admissible under the rules of evidence does not make it admissible despite the

24   Confrontation Clause. (*Crawford v. Washington, supra*, 124 S.Ct. at p. 1364).

25        Various formulations of this core class of "testimonial" statements exist.

26   Regardless of the precise articulation, some statements qualify under any definition

27

28   Traverse in Support of Petition for
     Writ of Habeas Corpus              11              No.  C 07-5379 SBA

1    --for example, *ex parte* testimony at a preliminary hearing. Statements taken by

2    police officers in the course of interrogations are also testimonial under even a

3    narrow standard. (*Crawford v. Washington, supra*, 124 S.Ct. at p. 1364).  The U.S.

4    Supreme Court took pains in *Crawford* to clarify that it used the term "interrogation"

5    in "its colloquial, rather than any technical legal, sense." (*Id*. at p. 1365, fn. 4.)

6         Allowing a police officer to testify about responses of suspected gang

7    members, victims, and witnesses to police questioning poses a serious threat to the

8    right to confront adverse witnesses. Involvement of government officers in the

9    production of testimony with an eye toward trial presents unique potential for

10   prosecutorial abuse--a fact borne out through history with which the Framers were

11   keenly familiar. This consideration does not evaporate when testimony happens to

12   fall within some broad, modem hearsay exception, even if that exception might be

13   justifiable in other circumstances. (*Crawford v. Washington, supra*, 124 S.Ct. at p.

14   1367, fn. 7.)

15        In the present case, Officer Nieves testified that in his opinion petitioner was a

16   West Side gang member. (RT 67).   He based this opinion on a number of things,

17   including an acquaintance with petitioner going back six years and at least seven

18    field investigation reports. (RT 597-600).  The Officer also opined that the crimewas

19   committed for the benefit of the West Side gang. (RT 603).   This was based partly

20   on the theory that an ongoing feud existed between the West Side gang and

21   Horseshoe, the gang affiliated with one of the witnesses. (RT 64). The expert did not

22   testify to the source of his information about the conflict between the gangs, only that

23   it may be related to "disrespect" to a West Side member's girlfriend (RT 65),

24   competition for low-level narcotics territory (RT 65-66), and destruction of the other

25   gang's graffiti "tags." (RT 64).

26        When a police officer questions an individual about his gang membership or

27

28   Traverse in Support of Petition for
     Writ of Habeas Corpus                    12                    No.  C 07-5379 SBA

1    speaks with gang members about gang activities, a reasonably objective observer

2    would understand that the officer is gathering information that may be available for

3    use in a prosecution. Such police interrogation is testimonial for Confrontation

4    Clause purposes. (*Crawford v. Washington, supra*, 124 S.Ct. at p. 1364) This

5    hearsay should not have been admitted, for it violates the Sixth Amendment, as

6    petitioner was denied the right to cross-examine the gang members or other sources

7    of information on which Nieves based his opinions. (*Id*. at pp. 1363-1367).

8        The Confrontation Clause violation is not avoided by casting the hearsay

9    testimony as the basis for Officer Nieves' expert opinion. Like the hearsay exceptions

10   that did not exist when the Sixth Amendment was ratified, the rule that an expert may

11   rely on  inadmissible evidence is of recent formulation.

12        The traditional rule is that an expert opinion is inadmissible if it is based upon

13   information obtained out of court from third parties. (*United States v. Bohie*, (9th Cir.

14   1971) 445 F.2d 54.)  The rationale behind this rule is that the trier of fact should not

15   be presented with evidence grounded in otherwise inadmissible hearsay statements

16   not subject to cross-examination and other forms of verification.

17        However, recent decisions, especially in the Federal courts, indicate there is

18   an emerging trend in favor of admissibility. (*United States v. Williams*, 447 F.2d 1285

19   (5th Cir. 1971) (en banc), cert. denied 405 U.S. 954 (1972); *Jenkins v. United States*,

20   113 U.S.App.D.C. 300, 307 F.2d 637 (1962) (en banc); *State Highway Comm. v.*

21   *Oswalt,* (1970) 463 P.2d 602; *United States v. Sims* (9th Cir. 1975) 514 F.2d 147,

22   149).

23        Here, the appellate court relied upon *People v. Thomas*, (2005) 130

24   Cal.App.4th 1202, to support its contention that experts may use otherwise

25   inadmissible hearsay to form an opinion. *Crawford* did not "undermine the

26   established rule that experts can testify to their opinions on relevant matters, and

27

28   Traverse in Support of Petition for
     Writ of Habeas Corpus                    13                    No.  C 07-5379 SBA

relate the information and sources upon which they rely in forming those opinions."

(*Id*. at p. 1210) This is true because experts are subject to cross examination about

his or her opinion and "the materials on which the expert bases his or her opinion are

not elicited for the truth of their content; they are examined to assess the weight of

the expert's opinion." (*Ibid*.)

Even if there was a strong emerging trend, in 1975, in favor of admissibility of

expert opinions based on inadmissible hearsay, and there is an "established rule" in

California allowing such admissibility, the admissibility of such expert opinion was not

established when the Sixth Amendment was ratified. Like the modern rules infringing

upon the Confrontation Clause which were struck down by *Crawford*, this recently

emerged trend should be seen for what it is: a limitation on the confrontation right

which the Framers never envisioned.

Even if the rule admitting opinions based upon inadmissible hearsay survives

*Crawford*, and even if Nieves' testimony of what many gang members told him is

labeled an opinion, the Confrontation Clause is nonetheless violated. The violation

posed by inadmissible hearsay is not cured by having an expert draw from that

inadmissible hearsay a conclusion that the matter asserted by the hearsay is correct.

In *United States v. Ordonez*, (9th Cir. 1984) 737 F.2d 793, the Ninth Circuit, having

ruled that certain ledger entries were inadmissible to prove the truth of the matter

asserted therein (*Id.* at p. 798), ruled also that an experts interpretation of those

ledger entries likewise offended the Confrontation Clause. (Id. at p. 806)

Here, the hearsay on which Nieves based his opinion that petitioner was a

gang member was not only used to assess the weight of Nieves' testimony, but was

used to prove that petitioner was in fact a member of the West Side gang. Similarly,

Nieves used the hearsay evidence supporting the theory of a feud between the

Gangs to draw a conclusion that the crime was related to and for the benefit of a

criminal street gang.

Consequently, petitioner's confrontation right was violated by the admission of the testimonial hearsay by gang members, in the absence of any opportunity to cross examine those gang members.

Violations of the Confrontation Clause are subject to harmless error analysis. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 307-308) Reversal due to constitutional error is not required where the State demonstrates beyond a reasonable doubt that the error did not contribute to the verdict. (*Chapman v.California* (1967) 386 U.S. 18, 24) The State cannot make that showing here.

Absent Officer Nieves' testimony that petitioner was currently a member of the West Side gang and his testimony that the crime was committed for the benefit the activities of West Side, the jury could not have found the criminal street gang enhancement true, for there was little other evidence to support these contentions. There was no direct connection between the shooting and the West Side gang: no talk on the street and no graffiti. (RT 612) A witness was a member of the rival gang, Horseshoe, but the victim was not. (RT 606) The victim simply raised his hands with his palms up and said "what's up." (RT 66) Petitioner drove down Mastic Street days after the incident, but he lived in the neighborhood (RT 608-9). Thus, without the erroneously admitted hearsay, the jury could not have found that the enhancement was true.  Petitioner was further prejudiced by the denial by the state court's denial of his petitioner for writ of habeas corpus.  That denial was an "objectively unreasonable" application of Sixth Amendment law. (*Wiggins v. Smith,* 539 U.S. 510; state court judgment was "objectively unreasonable" insofar as a claim of prejudicial inadmissible hearsay was rejected.)

/ / /

/ / /

1

2

III.  PETITIONER WAS DENIED HIS RIGHT TO A TRIAL BY IMPARTIAL JURORS WHEN JUROR NUMBER 11 FAILED TO DISCLOSE HIS RELATIONSHIP WITH A PROSECUTION WITNESS.

3       Under the Sixth and Fourteenth Amendments to the United States Constitution

4    and Article I, section 16 of the California Constitution, a person "accused of a crime

5    has a constitutional right to a trial by impartial jurors." (*In re Hitchings* (1993) 6

6    Cal.4th 97, 110) Voir dire examination protects the right to impartial jurors by

7    "exposing possible biases, both known and unknown, on the part of the potential

8    jurors. [Citation]" (Id. at p. 110) "[A] juror who conceals relevant facts or gives false

9    answers during the voir dire examination thus undermines the jury selection process

10   and commits misconduct." (Id. at p. 111).  Juror misconduct raises a presumption of

11   prejudice that may be rebutted by proof that no prejudice actually resulted. (Id at p.

12   118).

13      The appellate court acknowledged that "there is considerable question whether

14   a prospective juror's unintentional failure to disclose material information during voir

15   dire may constitute juror misconduct. In more that one instance, the California

16   Supreme Court has either expressly declined to decide the question or has

17   expressed its doubts on the issue." (*In re Hamilton* (1999) 20 Cal.4th 273, 300; *In re*

18   *Hitchings, supra* 6 Cal.4th at 115-116)

19      In *Hamilton*, the court stated that "[t]here is serious question whether honest

20   voir dire mistakes can ever form the basis for impeachment of a verdict." (*In re*

21   *Hamilton, supra*, 20 Cal.4th at p. 300) But "[w]hat is clear is that an honest mistake

22   on voir dire cannot disturb a judgment in the absence of proof that the juror's wrong

23   or incomplete answer hid the juror's actual bias." (*Ibid.*)

24      The question remains how a criminal defendant can gain proof that the juror's

25   wrong or incomplete answer hides the juror's actual bias. The *Hamilton* case arose

26   on a writ of habeas corpus where the Supreme Court issued an order toshow cause

27

28   Traverse in Support of Petition for
     Writ of Habeas Corpus                16                    No.  C 07-5379 SBA

limited to certain issues, including whether the juror was actually biased or incompetent, and whether she had concealed bias during the jury selection process. (*In re Hamilton, supra*, 20 Cal.4th at p. 280) In voir dire, the juror admitted she had learned details of the crime from a local newspaper but did not mention any other pretrial exposure, including information from television and other newspapers, and a conversation with a neighbor about the defendant's claim that someone else had committed the crime. (*Id.* at p. 297-298) Despite an earlier declaration that the alternate killer story was "ridiculous" and it convinced her that the defendant was guilty, the juror insisted at the evidentiary hearing that her skepticism did not cause her to prejudge petitioner's guilt. (*Id.*)

The referee as well as the Supreme Court found that the juror's admissions on voir dire were inadvertent, not intentional. (*Id.* at p. 298) The Court also separately determined that the juror was not biased at the time of the trial; any impression she had formed from her conversations and media exposure almost a  year before the trial began "was insignificant over time and had long since dissipated," (*Id.* at p. 300)

Here. Juror Number 11 committed misconduct when he failed to disclose that he knew the prosecution's witness, Officer Fonua. On voir dire, the juror admiitted he knew the County District Attorney, the Sheriff, and other police officers. On the third day of trial, Officer Fonua informed the court that he knew Juror Number 11.  (RT 561-562).  The juror's wife was the sister of the officer's girlfriend. (RT 562).  The officer stated, "I always see him at Christmas, Thanksgiving, and that kind of thing. You see him at the table. You talk to him".  ( RT 562).  When asked by the court if there was a blood relationship, the officer responded "No, but I see him quite often." (RT 562).

Juror Number 11 did not recognize the Officer at first but the two had been  together the weekend before. (RT 563). The juror responded, "Oh, of course.  I'm

not used to seeing you in your clothes. I guess we're related, Your Honor." (RT 563-564). Instead of conducting a factual inquiry into the potential bias of the witness, the court simply asked Juror Number 11 whether the relationship would affect his "ability to be fair and impartial in this case." (RT 564). The juror said it would not. (RT 564). When asked if he would give the officer's testimony any more weight than he ordinarily would, the juror responded "no." (RT 564).

While Juror Number 11's conduct was not necessarily willful or intentionally dishonest, his failure to divulge the relationship of his sister-in-law with a homicide detective deprived petitioner the ability to ensure an unbiased jury. In this case, even an honest mistake should disturb the judgment because the juror's incomplete answer to the voir dire questions probably hid his actual bias against petitioner. The two spent significant family holidays together and the juror referred to them as "related." Most importantly, the two had been together at a social gathering only two or three days before Officer Fonua was called to testify.

The state appellate court was satisfied that the juror could be fair and impartial Yet, the trial court's inquiry consisted of two cursory questions and the juror's blanket denial of any bias. An evidentiary hearing into the actual extent of the juror's bias should have been conducted. Otherwise, petitioner could never have the "proof" required by the *Hamilton* court of the juror's actual bias.

Further inquiry into the relationship and more specifically into the conversations between the two that may have occurred on the eve of trial could have revealed significant prejudice against the defendant. Unlike the factual situation in *Hamilton*, the potential bias here was ongoing; the relationship between the juror and the witness was currently close and would probably continue throughout the trial and beyond. There was no time between the misconduct and the trial; in fact, Juror Number 11 and Officer Fonua saw each other after the jury had been impaneled,

spending an evening together at a social gathering with ample opportunity to discuss petitioner's trial only days before facing each other in court.

At the very least, the facts here present a compelling argument that unintentional failures to disclose material information during voir dire can constitute juror misconduct. The court may then conduct further inquiry into the potential bias to ensure the defendant has an impartial jury. This policy will promote full disclosure by the jurors which would in turn illuminate bias during voir dire and allow the defendant to challenge the juror for cause or use a peremptory challenge. Petitioner was denied the right to do this and was thus prejudiced by impaneling a biased jury.  Petitioner was further prejudiced by the denial by the state court's denial of his petitioner for writ of habeas corpus.  That denial was an "objectively unreasonable" application of Sixth Amendment law. (*Wiggins v. Smith,* 539 U.S. 510; state court judgment was "objectively unreasonable" insofar as a claim of impartial jury was rejected.)

CONCLUSION

Based upon the reasons stated above, petitioner respectfully requests that his petition for writ of habeas corpus be granted.

Dated: February 5, 2008                    Respectfully submitted,


                                           _____
                                           Allen H. Schwartz
                                           Attorney for Petitioner,
                                           Lionel Rubalcava

`

Traverse in Support of Petition for
Writ of Habeas Corpus                      19                No.  C 07-5379 SBA

1    -

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28    Traverse in Support of Petition for
     Writ of Habeas Corpus                    20                        No.  C 07-5379 SBA