UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| LIONEL RUBALCAVA,<br><br>           Petitioner,<br><br>   vs.<br><br>TOM FELKER, Warden,<br><br>           Respondent. | Case No. C 07-5379 SBA (pr)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

I.     <u>**INTRODUCTION**</u>

      Petitioner Lionel Rubalcava, a prisoner committed to the custody of the California Department of Corrections, through counsel, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter is now submitted for the Court's consideration of the merits of the petition. For the reasons discussed below, the petition will be DENIED as to all claims.

II.     <u>**BACKGROUND**</u>

      On November 23, 2003, a jury in Santa Clara County Superior Court convicted Petitioner of attempted premeditated murder (Cal. Penal Code §§ 187, 189, 664). The jury also found true all attendant enhancement allegations, including that the offense was committed for the benefit of a criminal street gang (Cal. Penal Code § 186.22(b)(1)). The trial court sentenced Petitioner to 25 years to life and a consecutive six-year term.

      Petitioner appealed his conviction to the California Court of Appeal, Sixth Appellate District, which affirmed the judgment in an unpublished decision on December 28, 2005. Petitioner then filed a petition for review with the California Supreme Court, which was denied on March 15, 2006. Thereafter, on March 2, 2007, Petitioner filed a writ of habeas corpus with the California Supreme Court, which was denied on August 15, 2007.

The instant petition for writ of habeas corpus was filed on October 22, 2007. The Court issued an order to show cause on November 7, 2007. Respondent filed an answer and memorandum of points and authorities on January 7, 2008. Petitioner then filed a traverse on February 5, 2008.

The following facts are taken from the opinion of the California Court of Appeal.

> As of April 2002, Raymond R., the victim (21 years of age at the time of trial), lived on Mastic Street in San Jose. He previously lived on the east side of San Jose, where he had been a member of the Varrio East Side Norteño gang, or VEN (East Side). As was customary with Norteño gangs, East Side members wore red and identified with the number 14. Raymond considered East Side's rivals to be the Sureño gangs. He was aware that on occasion, members of one Norteño gang fought members of another Norteño gang, and that those conflicts sometimes resulted in stabbings and shootings.

> Raymond was aware of the Norteño gang known as West Side Mob or WSM (West Side). He knew that West Side members lived in the area around Mastic. Raymond believed that West Side had a reputation of being "no good," based upon "a lot of rumors and mistakes they made."

> On the afternoon of Friday, April 5, Raymond went to the movies with his brother (Eric M.), his sister (Jennifer R.), and a friend (Daniel C.). Raymond was wearing a red belt that hung down to mid-thigh (below his untucked shirt); its significance (to Raymond) was "[g]ang affiliation." The group arrived home in the late afternoon. Raymond went with Daniel and Eric next door for a short visit with Raymond's friend and next-door neighbor, David G., Jr.

> While visiting in David's front yard, Raymond observed a "greenish blue" SUV-that he described to the police after being shot as a green Toyota 4Runner-driving slowly (five to 10 miles per hour) down Mastic from Goodyear Street toward Humboldt Street. Raymond looked at the passenger's side of the vehicle as it passed by him. David told Raymond that the driver "was just somebody that was tripping ['ha[d] a problem'] all day." The SUV made a U-turn, and traveled back up Mastic toward Goodyear.

> Mastic runs in a northwest to southeast direction, and is bordered on the north by Goodyear and on the south by Humboldt. The shooting occurred on the west side of Mastic near the corner of Mastic and Goodyear.

> Raymond went back to his house and then approached the street. The SUV came to a stop in front of Raymond's house as he was standing at the curb. Raymond made eye contact with the driver, who was about 12 feet from him. The driver's window was down. As he looked at the driver, Raymond threw up both hands (with palms raised and facing each other), saying, "'What's up?'"

> Raymond was not issuing a challenge. "[He] was thinking, 'Is there a problem?'" because the driver had stopped in front of

his house and was staring at him. He wanted to find out what the driver wanted. But Raymond was willing to take care of the problem (if there was one) by fighting.

The driver looked ahead towards Goodyear, thereby giving Raymond a profile view as well. It was still light at the time, and Raymond had an unobstructed view of the driver. The driver then turned back to face Raymond, pulled out a black gun, and fired it once at Raymond. The SUV proceeded up Mastic and turned right on Goodyear. The shooting took place shortly before 5:30 p.m.

Raymond was wounded in the left side of his chest, and fell to the ground. He was taken by ambulance to the hospital. Raymond was hospitalized for about two months and remained (as of the time of trial in November 2003) paralyzed from the waist down.

Raymond gave an in-court identification of defendant as the driver of the SUV who shot him. Before April 5, 2002, Raymond had never seen defendant and had never heard of him. Four days after the shooting, Raymond likewise identified defendant as the perpetrator from a photo lineup presented to him in the hospital by Detective Joe Perez.

On the afternoon of April 5, Raymond's brother, Eric M. (14 years old at the time of trial), went with his siblings to a movie. After they returned home, they were in the front yard. There were five other people out front near the home of David, the next-door neighbor.

A green Toyota attracted Eric's attention because it stopped on Mastic between David's house and Eric's house. Eric was standing on the sidewalk to Raymond's left. The driver's window was down, and Eric had a clear view of the driver. Eric observed four men in the vehicle. The driver made a remark to Raymond that Eric did not hear. Eric was nervous because the driver "[l]ooked strange [at his] brother." Raymond stepped off the curb onto the street, saying, "'What's up?'" The driver pulled out a black gun held in his left hand and shot Raymond. The vehicle then traveled down Mastic and turned right on Goodyear.

Eric gave an in-court identification of defendant as the person who shot Raymond. Additionally, on April 8, Eric was shown a photographic lineup by two police officers; he identified defendant as the person who had shot his brother.

Jennifer R. (17 years old at the time of trial) is Raymond's younger sister. She was inside her house at the time of the shooting and did not see the person who shot her brother.

On Sunday night, April 7, at about 8:15, Jennifer was at home taking care of her younger siblings while her mother was at the hospital. Raymond's friend, Daniel, was also there. While Jennifer was in the front yard, a dark-colored truck pulled up- facing the wrong way on Mastic with the driver's side facing her home. (Jennifer reported to the police on April 7 that the truck was a GMC model with an extended cab, a DVD player and a video screen mounted on the dash.) The driver said, "'Hey, you, get over here.'" Jennifer saw a dark object in the driver's left hand. She was afraid, feeling like the driver was "forcing [her] in a mean way" to

approach the truck. She told the driver that her brother had been shot and refused to go to the truck.

Jennifer asked her sister to call the police. The truck remained outside for a couple of minutes, but left before the police arrived. Jennifer identified defendant in court as the driver of the truck. She also identified defendant as the driver from a photo lineup shown to her on April 10.

Daniel C. (22 years old at the time of trial) knew defendant, defendant's brother, and defendant's cousin because they all lived on Palm Street in San Jose. (Palm parallels Mastic and is located five blocks to the southwest of Mastic.) Daniel considered defendant a friend and hung out with him on occasion before April. As of April, defendant owned a black pickup truck.

Daniel had known about West Side since he was a little boy. Defendant was a West Side member, as was Daniel's cousin. Daniel used to hang out sometimes with members of both West Side and another Norteño gang, Valerio Horseshoe or VHS (Horseshoe). In August 2001, Daniel was stabbed by a person he believed to be Horseshoe, because Daniel's cousin had gotten into a fight with a Horseshoe member.

As of April 5, Daniel and Raymond had been good friends for several months. Daniel stayed at Raymond's home for a while. Raymond talked about East Side and wore a red belt with "N" on it. Daniel also knew David from high school. David wore red colors and hung out with Horseshoe members.

Daniel went to the movies with Raymond and Raymond's siblings on April 5. When they arrived home, Daniel ran into his friend, David, who had just pulled up with some friends. While Daniel was across the street speaking with one of David's friends, he observed a black truck moving on Mastic (proceeding toward Goodyear) pull up to Raymond's house. Daniel saw two people in the vehicle but did not see the driver's face. He saw Raymond approach the vehicle and then heard one shot fired. Before the shot was fired, Daniel heard David say, "'Go in the house.'" David went into his house before the shot was fired.

Later that evening, Daniel got together with David. Based upon what David told him he had seen, Daniel encouraged David to contact the police to report what he had witnessed.

On Sunday, April 7, while visiting David on his front porch, Daniel observed a black truck pull up to Raymond's house but did not see the driver's face. Daniel thought that it was related to Friday's shooting, and he ran through David's back yard, hopped the fence, and entered Raymond's house through the back door. Daniel called the police. Later that evening, David told Daniel that "he thinks or he might know who shot Raymond."

San Jose Police Officer Steven Spillman was involved in the investigation of the shooting. He was not made aware on April 5 that David was a potential witness. Upon being so informed two days later, Officer Spillman canvassed the area looking for David.

Officer Spillman and his partner, Officer Topui Fonua, interviewed David on Sunday, April 7, at about 9:00 p.m. David

was evasive and appeared reluctant to talk to the officers. During the interview, David stated that he had been at the scene of the April 5 shooting and described the subject vehicle as being a blue or green Toyota 4Runner. He told the officers that he recognized the driver as being a gang member from the area. He stated further "that he had seen the driver on prior occasions in his neighborhood and at his home, that he didn't know the driver by name but knew him by face, and that he was frightened of this person, that this person had come over to his home on a prior occasion asking him about Sureño gang members in the neighborhood, and that he appeared ... to be crazy.... [T]he individual had a wide-eyed look on his face and appeared to be ranting about Sureños and [David's] gang affiliation." David told the officers that, when he saw this person driving the Toyota SUV on Mastic, he told Raymond and Daniel to get in the house.

David also told the police on April 7 that he had seen a black GMC pickup truck with chrome rims on Mastic that evening. He told the officers that he had recognized the black truck from the neighborhood and that he could take the police to the location where he had seen it parked. David said that the driver of this truck was the same person who had driven the Toyota 4Runner two days earlier when the shooting occurred. He also told the police that he would be able to recognize this person if he saw him again.

Officers Spillman and Fonua had David ride in the back of their patrol car, and he directed them to the area of Willow Street and Palm Street. As they drove to the site, David slouched down in the patrol car because he was fearful that he would be recognized. They located a black truck at 955 Palm Street that David believed was the truck he had seen that evening.

David met the two police officers the next afternoon, April 8. They began driving around the area in an unmarked car, and David "said he thought he knew who the suspect was" and then identified defendant by name. This was the first instance in which either officer had become aware of the identity of defendant as a possible suspect in the shooting.

The officers then took David to the police station and showed him a photo lineup that Officer Fonua had prepared. David identified defendant from the photo lineup as being "A, ... the person that confronted [him] at [his] home about a month ago roughly; [¶] B. [t]his is the person that drove down Mastic prior to Raymond, the victim, getting shot; and [¶] C. On Sunday [April 7], this is the person that pulled up in his black pickup truck to contact family members of the victim[ ]." David expressed no uncertainty about his identification of defendant; according to Officer Fonua, "He was sure."

Later that afternoon, Officers Spillman and Fonua traveled to the victim's home on Mastic. Officer Fonua showed a photo lineup to Eric, who identified defendant as the man who had shot Eric's older brother, Raymond.

On the evening of April 8, Officer Spillman made a patrol stop of the black GMC pickup truck with chrome wheels that

David had identified the previous evening. Defendant was driving the vehicle at the time.

David G., Jr. (23 years old at the time of trial) had known his next-door neighbor and good friend, Raymond, since February. He knew that Raymond was Norteño. David wore red sometimes as a Norteño color and considered himself to be a Norteño because he had "run with them." He had been familiar with both West Side and Horseshoe for over ten years; he hung out with people who were members of both gangs, but considered himself to be closer to Horseshoe. David was aware that, as of April, there were problems between West Side and Horseshoe, and that the two gangs "didn't get along."

On April 5, after David arrived at home with some friends, he visited briefly with Raymond, who was in the front yard with his brother, Eric, and Daniel. When he was walking to his house, David noticed a vehicle driving slowly down Mastic towards Humboldt. "[T]he driver saw [David], and [David] recognized him." The driver and the vehicle's two other occupants were looking at David. He thought that they were coming for him. David was concerned for his safety because the vehicle was moving slowly and he had recognized the driver from a previous encounter with him. The driver had come to his house four months earlier and had "asked [David] to go with him to go pick up some drugs." David testified that on that prior occasion, the person "got madder" when David asked him if he was West Side.

David told Raymond and their mutual friend, Daniel, to get off the street. David observed the vehicle make a U-turn and was concerned that "a fight was going to break out or something" because "we all had red belts hanging down." David went to the side of his house. He then heard a gunshot, went to the front yard with his father, and saw Raymond lying in the street. David thought that he had been the intended target.

On the evening of April 7, David saw a black truck pull up in front of Raymond's house. Daniel was very afraid and came running up to David's front porch. David unlocked the front door and they both went inside.

San Jose Police Officer Rafael Nieves was assigned as the gang intelligence officer for the Violent Crimes Enforcement Team. He explained that there were two sets of Hispanic street gangs in San Jose, Norteños and Sureños.

At the time of trial, one of the neighborhood street gangs under the "giant umbrella" of Norteño was West Side, which had approximately 167 members and associates. Its identifying sign was "WSM," but it also went simply by the name "Mob"; it had adopted the color red and the number 14 generally associated with Norteño gangs. It operated within a specific area of San Jose, generally bordered by Highway 280 on the north, Highway 87 on the west, Monterey Road/First Street on the south, and San Jose Avenue on the south. (This area included the area of the shooting on Mastic as well as the area on Palm where David pointed out to Officers Spillman and Fonua the black truck that he had seen on April 7.)

The primary activities of West Side consisted of assaults with deadly weapons, homicide, robbery, aggravated assault, and felony vandalism. Officer Nieves opined that West Side members had engaged in a pattern of criminal gang activity. West Side members had been accused of committing at least four murders in the five years before the trial. Two gang-related homicides involving West Side members had been the subject of prosecution shortly before defendant's trial. One involved Chad Cleveland, who was tried and convicted of the murder (including a gang enhancement) of one Mexican National and the wounding of another. The other homicide concerned Jaime Valenzuela, who was convicted of the murder (including a gang enhancement) of an individual in retaliation for an act of vandalism on Valenzuela's car by Sureños. Officer Nieves was also aware of over 12 assaults attributed to West Side in the six years before trial.

Another Norteño street gang in San Jose-located on the west side of Highway 87-was Horseshoe. Officer Nieves testified that there were rivalries in San Jose between certain Norteño street gangs. As of April, there was conflict between West Side and Horseshoe. (The problems between the two groups dated as far back as 1997 or 1998.) In the area of Willow Street, a Horseshoe "tag" (graffiti) had been written over with West Side tags. In addition, Horseshoe members had become upset because West Side members had frequented a park located in the middle of Horseshoe's area. And there had been a dispute involving a girl who was in a relationship with a West Side member but who had previously been the girlfriend of a Horseshoe member. Lastly, there had been competition between West Side and Horseshoe over "low-level narcotic[s] trafficking."

Officer Nieves testified that he had known defendant for six years. He opined that, as of the time of trial, defendant was a West Side member. Officer Nieves based this opinion on a number of things, including a photograph showing defendant with a number of West Side members (many of whom were exhibiting West Side gang signs), and at least seven field investigation reports. In addition, in May, Defendant had written a letter in jail to another inmate that he had signed, "Much love, your homeboy Lionel, from that mad ass Varrio Oeste Lado Mobin [West Side]."

Lastly, Officer Nieves opined that the April 5 shooting of Raymond had been done for the benefit of and to further the criminal activity of West Side. This opinion was based upon (among other things) (1) the circumstances under which the crime occurred (i.e., a vehicle approached southbound, its occupants exchanged looks with two people on the street, the vehicle made a U-turn, stopped, the victim raised his hands, approached the vehicle, and said, "What's up?" and the driver then shot one round at the victim and fled); (2) one of the witnesses, David, was a member of Horseshoe, which group had an ongoing feud with West Side; (3) the common pattern of one gang that is challenged responding with strength (including acts of violence and intimidation) in order to promote the gang's respect and notoriety; (4) the shooting of Raymond was apparently done because of his association with David, who, in turn was associated with Horseshoe; and (5) the shooter's return to Mastic two days after

the crime as having been a method of intimidating witnesses, including younger people, which thereby increased the gang's notoriety in the neighborhood.

Beginning in or about March, Stephanie L. spoke on the telephone several times with a man who identified himself as "James." "James" told Stephanie that he had gotten her pager number from his cousin, Junior. (Stephanie had given Junior her pager number after meeting him at a gas station in San Jose.) Stephanie and "James" made a plan to go to the movies in Hollister (where Stephanie lived) on Friday, April 5. The movie was scheduled to begin at 7:00 p.m.

They spoke on April 5 at 4:45 p.m. "James" paged Stephanie at about 6:20 p.m. while she was still at home. She called him back at 6:26 p.m. and gave him directions to meet at the McDonald's in Hollister, a very short distance from the movie theater. Stephanie met "James" at the McDonald's sometime after 6:38 p.m. He was outside of his black pickup truck, which had a video screen to the right of the steering wheel.

They stayed only about three minutes before leaving for the theater. They arrived before the movie started. She spoke to him one more time that weekend. "James" never told Stephanie his last name or said that he went by any other first name.

Stephanie received a call from the San Jose Police Department early on Tuesday morning, April 9. She later met with Detective Perez at the police station and showed him the ticket stubs for the April 5 movie. Stephanie attended two lineups. She did not identify anyone in the first lineup. After she was shown a mug shot of the person who had been arrested, Stephanie asked to see that individual in person. In the second lineup, she identified defendant as being the person she knew as "James" with whom she had attended the movies on April 5. Stephanie also gave an in-court identification of defendant as that person.

Sergeant Edgardo Garcia interviewed Raymond in the hospital twice on the evening of April 6. During the first interview-while Raymond was still on a ventilator and could not speak-he raised his hand and signaled the number "three" (signifying a Sureño) in response to the question as to who had shot him. Later that evening, when Raymond could speak but was in considerable pain, he told Sergeant Garcia that he had been shot by a Hispanic male, age 19 to 25, wearing a gray sweatshirt and a red hat.

On Sunday evening, April 7, Sergeant Michael Brown interviewed Raymond at the hospital. Raymond appeared to be medicated at the time. He described the gunman "as a Hispanic male in his early to mid 20s with a thin mustache and goatee, thin build, wearing a black baseball cap with a gray brim, a black or gray sweatshirt." Raymond also said that the vehicle of the person who shot him was a green Toyota 4-by-4 and that he believed that he would recognize the shooter if he saw him again.

Defendant-25 years old at the time of trial-wrote with his left hand but was otherwise right-handed. He was at one time a West Side gang member, as were some of his friends and two of

- 8 -

his cousins. He was "jumped in" (joined) the gang when he was about 13 or 14 years old. He had "never jumped out of [West Side], although [he] ha[d] separated [him]self somewhat, for the most part."

Defendant did not go to David's house in or about December 2001. He did not have any role in the theft or later burning of a Toyota SUV, and never rode in the vehicle. Defendant denied that he had shot Raymond on April 5.

On April 5, defendant had the day off from work. Several days before, he had made a date with Stephanie-to whom he had identified himself as "James" -to go to the movies in Hollister that night. After spending most of the day with a friend, Peter, defendant spoke with Stephanie at about 4:45 p.m. and made a plan to meet at the McDonald's in Hollister before the movie. He left San Jose for Hollister sometime after 5:00 p.m.; his departure was probably not after 5:30 p.m. It took between one to one and one-quarter hours to get from San Jose to Hollister that evening. After arriving at the McDonald's, defendant paged Stephanie and waited about 15 to 20 minutes for her to arrive. After going to the movies with Stephanie and then stopping at a gas station, defendant accompanied her home.

On the evening of April 7, defendant went cruising in his black GMC Sierra truck with a friend, Martin, who defendant believed was homeless. Defendant was driving on Mastic (coming from Peter's house), and saw a girl who he thought "was kind of cute." (Defendant identified her at trial as being Jennifer.) He stopped to say "hi" to her, and they spoke for two to three minutes. Defendant asked her to come to his vehicle. At first, Jennifer didn't seem upset; later, she became upset, said that her brother had been shot, and asked for someone to call the police. (This was the first defendant had heard of the shooting.) Defendant left, and parked his truck on Palm at his uncle's residence.

Defendant was arrested late in the evening on April 8. He was not completely honest with the police; he did not tell the police that he had used drugs at a party he had attended on April 5.

Defendant had been previously convicted of a felony, i.e., second-degree burglary (violation of §§ 459, 460, subd. (b)). He was also convicted of making terrorist threats (violation of § 422). After serving a jail sentence, he twice violated the term of his probation that he not associate with gang members; he continued to consort with West Side members. His probation was revoked and he was committed to prison. After his release, defendant violated five conditions of his parole, including his continued use of narcotics and his continued association with gang members.

Detective Joe Perez was involved in the investigation of the April 5 shooting. On the afternoon of October 4 (a Friday), he drove from San Jose to Hollister. Commencing at 5:26 p.m., Detective Perez drove from the scene of the shooting on Mastic to the McDonald's in Hollister, stopping briefly at defendant's home on Palm. He obeyed all speed limits, and stayed with the flow of traffic; on Highway 101, the traffic was moderate and the flow of

traffic ranged between 55 to 70 miles per hour. Detective Perez arrived at the McDonald's in Hollister at 6:27 p.m.

Resp't. Ex. B (footnotes omitted.)

## III.   STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review on the merits. Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004). It is error for a federal court to review de novo a claim that was adjudicated on the merits in state court. See Price v. Vincent, 538 U.S. 634, 638-43 (2003).

### A.   SECTION 2254(D)(1)

Challenges to purely legal questions resolved by a state court are reviewed under § 2254(d)(1), under which a state prisoner may obtain habeas relief with respect to a claim adjudicated on the merits in state court only if the state court adjudication resulted in a decision that was "contrary to" or "involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." Williams v. Taylor, 529 U.S. 362, 402-04, 409 (2000). While the "contrary to" and "unreasonable application" clauses have independent meaning, id. at 404-05, they often overlap, which may necessitate examining a petitioner's allegations against both standards, see Van Tran v. Lindsey, 212 F.3d 1143, 1149-50 (9th Cir. 2000), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63, 70-73 (2003).

**1.     Clearly Established Federal Law**

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.  "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." Id.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).  If there is no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law.  See, e.g., Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004).

The fact that Supreme Court law sets forth a fact-intensive inquiry to determine whether constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established'" by the Supreme Court.  Williams, 529 U.S. at 391.  There are, however, areas in which the Supreme Court has not established a clear or consistent path for courts to follow in determining whether a particular event violates a constitutional right; in such an area, it may be that only the general principle can be regarded as "clearly established." Andrade, 538 U.S. at 64-65.  When only the general principle is clearly established, it is the only law amenable to the "contrary to" or "unreasonable application of" framework.  Id. at 73.

Circuit decisions may still be relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established." Clark v. Murphy, 331 F.3d 1062, 1070-71 (9th Cir.), cert. denied, 540 U.S. 968 (2003); Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 1999).

**2.     "Contrary to"**

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A "run-of-the-mill state-court decision" that correctly identifies the controlling Supreme Court framework and applies it to the facts of a prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams, 529 U.S. at 406. Such a case should be analyzed under the "unreasonable application" prong of § 2254(d). See Weighall v. Middle, 215 F.3d 1058, 1062 (9th Cir. 2000).

### 3.    "Unreasonable Application"

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 412-13. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; accord Middleton v. McNeil, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must be not only erroneous, but objectively unreasonable); Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

Evaluating whether a rule application was unreasonable requires considering the relevant rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it is more general, the state courts have more leeway. Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). Whether the state court's decision was unreasonable must be assessed in light of the record that court had before it. Holland v. Jackson, 542 U.S. 649, 651 (2004) (per curiam).

The objectively unreasonable standard is not a clear error standard. Andrade, 538 U.S. at 75-76 (rejecting Van Tran's use of "clear error" standard); Clark, 331 F.3d at 1067-69 (acknowledging the overruling of Van Tran on this point). After Andrade,

> [t]he writ may not issue simply because, in our determination, a state court's application of    federal law was erroneous, clearly or otherwise. While the "objectively unreasonable"  standard is not

> self-explanatory, at a minimum it denotes a greater degree of deference to   the state courts than [the Ninth Circuit] ha[s] previously afforded them.

Id.  In examining whether the state court decision was unreasonable, the inquiry may require analysis of the state court's method as well as its result.  Nunes v. Mueller, 350 F.3d 1045, 1054 (9th Cir. 2003).

**B.    SECTIONS 2254(D)(2), 2254(E)(1)**

A federal habeas court may grant a writ if it concludes a state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  An unreasonable determination of the facts occurs where a state court fails to consider and weigh highly probative, relevant evidence, central to a petitioner's claim, that was properly presented and made part of the state court record.   Taylor v. Maddox, 366 F.3d 992, 1005 (9th Cir. 2004).  A district court must presume correct any determination of a factual issue made by a state court unless a petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

Section 2254(d)(2) applies to an intrinsic review of a state court's fact-finding process, or situations in which the petitioner challenges a state court's fact-findings based entirely on the state court record, whereas § 2254(e)(1) applies to challenges based on extrinsic evidence, or evidence presented for the first time in federal court.  See Taylor v. Maddox, 366 F.3d 992, 999-1000 (9th Cir. 2004).  In Taylor, the Ninth Circuit established a two-part analysis under §§ 2254(d)(2) and 2254(e)(1).  Id.  First, federal courts must undertake an "intrinsic review" of a state court's fact-finding process under the "unreasonable determination" clause of § 2254(d)(2).  Id. at 1000.  The intrinsic review requires federal courts to examine the state court's fact-finding process, not its findings.  Id.  Once a state court's fact-finding process survives this intrinsic review, the second part of the analysis begins by dressing the state court finding in a presumption of correctness under § 2254(e)(1).  Id.  According to the AEDPA, this presumption means that the state court's fact-finding may be overturned based on new evidence presented by a petitioner for the first time in federal court only if such new evidence

amounts to clear and convincing proof a state court finding is in error.  See 28 U.S.C.

§ 2254(e)(1).  "Significantly, the presumption of correctness and the clear-and-convincing

standard of proof only come into play once the state court's fact-findings survive any intrinsic

challenge; they do not apply to a challenge that is governed by the deference implicit in the

'unreasonable determination' standard of section 2254(d)(2)."  Taylor, 366 F.2d at 1000.

### C.   EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas

proceedings either the fact or length of their confinement are required first to exhaust state

judicial remedies, either on direct appeal or through state collateral proceedings, by presenting

the highest state court available with a fair opportunity to rule on the merits of each and every

claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c); Granberry v. Greer, 481

U.S. 129, 133-34 (1987).  It is undisputed that Petitioner exhausted his state court remedies as

to the claims raised in his petition.  Specifically, Petitioner exhausted his claims through direct

appeals to the California Court of Appeal and California Supreme Court, and a petition for writ

of habeas corpus to the California Supreme Court.[1]

## IV.   **DISCUSSION**

Petitioner raises three claims: (1) denial of a fair and impartial jury because a juror

failed to disclose that he knew a prosecution witness, and thereafter the trial court refused to

remove the juror for cause; (2) denial of his right to confront and cross-examine witnesses

when a gang expert relied on hearsay statements by other gang members; and (3) he is innocent

as a result of the recantation of the victim's trial testimony, who now declares he is uncertain

Petitioner was the shooter.

---

[1] Where, as here, the California Supreme Court denies review of Petitioner's claim without explanation, the Court looks to the last reasoned state court decision in conducting habeas review.  See Shackleford v. Hubbard, 234 F.3d 1072, 1079 (9th Cir. 2000) (citation omitted), cert. denied, 534 U.S. 944 (2001) (the district court "looks through" the unexplained California Supreme Court decision to the last reasoned state court decision).  In the instant case, the California Court of Appeal rendered the last reasoned state court decision.

## A. Juror Misconduct

As noted above, Petitioner alleges juror misconduct based on a juror number eleven's failure to disclose that he knew a prosecution witness during voir dire, and that the trial court violated of Petitioner's right to an impartial jury when it denied his request to remove the juror.

### 1. Standard of Review

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors. U.S. Const. amend. VI; see Irvin v. Dowd, 366 U.S. 717, 722 (1961). "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury." Tinsley v. Borg, 895 F.2d 520, 523-24 (9th Cir. 1990) (internal quotations omitted). However, the Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation." Smith v. Phillips, 455 U.S. 209, 217 (1982). The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Id. Due process only means a jury capable and willing to decide the case solely on the evidence before it and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Id. Such determinations may properly be made at a hearing. Id.

The Ninth Circuit has recognized that to disqualify a juror for cause requires a showing of actual bias or implied bias; that is, "bias in fact, or bias conclusively presumed as a matter of law." United States v. Gonzalez, 214 F.3d 1109, 1111-12 (9th Cir. 2000). There are three theories of juror bias based on a misstatement by a juror during voir dire: (1) McDonough-style bias (i.e., the juror fails to answer honestly and, had he answered correctly, the information would have provided a basis for a challenge for cause, see McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548 (1984)), (2) "actual bias, which stems from a pre-set disposition not to decide an issue impartially," and (3) "implied (or presumptive) bias, which may exist in exceptional circumstances where, for example a prospective juror has a relationship to the crime itself or to someone involved in a trial, or has repeatedly lied about a material fact to get on the jury." Fields v. Brown, 503 F.3d 755, 766 (9th Cir. 2007) (en banc).

If a juror failed to answer a voir dire question correctly, a petitioner may obtain a new trial by showing: (1) that the juror failed to answer honestly a voir dire question, and (2) that this undermined the impartiality of the petitioner's jury. See Dyer v. Calderon, 151 F.3d 970, 973 (9th Cir. 1998) (en banc). The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of the trial. See McDonough, 464 U.S. at 556. Forgetfulness, for example, does not indicate lack of impartiality. See United States v. Edmond, 43 F.3d 472, 473-74 (9th Cir. 1994) (no misconduct where district court found juror's testimony that he forgot about being victim of armed robbery truthful).

### 2. Relationship of Juror Number Eleven to Witness

During voir dire, juror number eleven affirmed that he would judge the testimony of a police officer by the same standards he would apply to any other witness. Resp't. Ex. E at 14. He also reported that he knew the District Attorney and Sheriff, but did not identify any other peace officers. Id. at 13. However, before testifying, one of the prosecution's witnesses, Officer Topui Fonua, disclosed to the trial court that he knew the juror.

The witness told the court that the juror was his girlfriend's brother-in-law. RT 561-62. Petitioner objected, alleging that the witness now enjoyed added credibility. RT 562. When the trial court examined the juror about whether he had any relationship to the witness, the juror initially told the court that the witness looked familiar but was not aware of any relationship between the two. RT 563. When the witness reminded the juror that they had seen each other at a gathering over the past weekend, the juror responded: "Oh, of course. I'm not used to seeing you in your clothes. I guess we're related, Your Honor." RT at 563-64. When the court asked the juror whether his relationship would affect his ability to be fair and impartial, the juror responded that it would not, and that he would not give the witness' testimony any more weight than other witnesses. RT 564.

Petitioner's claim fails because he has not shown that (1) juror number eleven failed to honestly answer a voir dire question and (2) that this failure undermined the impartiality of Petitioner's jury. In this case, there is no evidence in the record that the juror failed to honestly

- 16 -

answer a voir dire question.  Although it is true that the juror did not mention his acquaintance

with the witness during voir dire, there is no indication that the juror purposely concealed this

fact or gave false answers.  When asked by the trial court, the juror did not initially recognize

the witness.  Even after the witness reminded him that they had seen each other over the past

weekend, the juror's response was that he was not "used to seeing [Officer Fonua] in [his]

clothes," suggesting that the juror was not even aware that the witness was a peace officer, yet

alone that he would be testifying in Petitioner's trial.  RT 563-564.

The California Court of Appeal found that there was "no evidence the juror feigned

ignorance" or that "at the time of voir dire, knew that the person he occasionally saw at

gatherings—whom he knew as the boyfriend of the juror's wife's sister—was a peace officer."

Resp't. Mem. at 14.  There is no evidence that the juror knew the witness was a peace officer at

the time of voir dire, and therefore, based on the record, the juror did not give any false

answers during voir dire.  Thus, because the Court finds that juror number eleven's answers

were not dishonest or false, there is no need to reach the question of impartiality.  But even

juror number eleven concealed his relationship to the witness, the Court notes that the trial

conducted a thorough voir of the juror to ensure that his relationship to the witness had no

effect on his ability to be a fair and impartial juror.  At most, the record shows that the

nondisclosure was the result of the juror's forgetfulness, rather than any intention to purposely

conceal.  Forgetfulness by itself does not indicate lack of impartiality.  See Edmond, 43 F.3d at

473-74.  Accordingly, Petitioner's right to an impartial jury was not violated when the trial

court denied his request to remove juror number eleven.

**B.    CONFRONTATION CLAUSE**

Petitioner asserts that the trial court's admission of hearsay from a criminal street gang

expert violated his right to confront and cross-examine witnesses against him under Crawford

v. Washington, 541 U.S. 36 (2004).  Pet. at 5.  Petitioner alleges that in order for the gang

expert to develop his theory that Petitioner shot victim because victim was associating with a

member from a rival gang, the gang expert would have had to rely on hearsay statements made

by other individual gang members.  Id. at 13.

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with witnesses against him."  U.S. Const. amend. VI. The federal confrontation right applies to the states through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403 (1965).  The Confrontation Clause applies to all "testimonial" statements.  See Crawford, 541 U.S. at 50-51.  "Testimony . . . is typically a solemn declaration or affirmation made for the purpose of establishing or proving some fact." Id. at 51 (citations and quotation marks omitted); see id. ("An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.").  The Confrontation Clause applies not only to in-court testimony but also to out-of-court statements introduced at trial, regardless of the admissibility of the statements under state laws of evidence.  Crawford, 541 U.S. at 50-51.

Confrontation Clause claims are subject to harmless error analysis.  United States v. Nielsen, 371 F.3d 574, 581 (9th Cir. 2004) (post-Crawford case); see also United States v. Allen, 425 F.3d 1231, 1235 (9th Cir. 2005).  For purposes of federal habeas corpus review, the standard applicable to violations of the Confrontation Clause is whether the inadmissible evidence had an actual and prejudicial effect upon the jury.  See Hernandez v. Small, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)); Webb v. Lewis, 44 F.3d 1387, 1393 (9th. Cir. 1994).

Officer Rafael Nieves, a criminal street gang expert, testified that as a result of his investigation, he learned that Petitioner shot the victim for the benefit of Petitioner's gang because the victim had been associating with a member of a rival gang.  Pet. at 13.  He based his opinion on a number of things, including his acquaintance with Petitioner and field investigation reports.  RT 597-600.  Petitioner contends that the expert's testimony violates the Confrontation Clause because it was based on hearsay the expert gathered from other gang members, and that hearsay was then used to prove that Petitioner was a gang member. Traverse at 14.

A review of the record indicates that whatever conversations the expert may have had with other gang members, he did not testify to the truth of their statements at trial.  Rather, any

such statements the expert relied upon were used to form the basis for his opinion. The Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." Crawford, 541 U.S. at 59 n. 9 (citing Tennessee v. Street, 471 U.S. 409, 414 (1985)); see Moses v. Payne, 555 F.3d 742, 755 (9th Cir. 2009). Furthermore, both California and Federal rules regarding evidence permit testimony by an expert even where the expert's opinion is based on inadmissible hearsay evidence as long as the evidence is of a kind experts in the field regularly consult. See Cal. Evid. Code § 801; N. Am. Capacity Ins. Co. v. Claremont Liability Ins. Co., 177 Cal.App.4th 272, 294 (2009); see also Fed. R. Evid. 703; United States v. Steed, 548 F.3d 961, 976 n. 13 (11th Cir. 2008) (noting that there exists no Supreme Court precedent pertaining to an expert witness' reliance on otherwise inadmissible sources); but cf. United States v. Mejia, 545 F.3d 179, 197 (2nd Cir. 2008) (noting that a police expert's testimony explaining the inadmissible evidence he relied upon in reaching his conclusion may implicate the Confrontation Clause where the expert "simply transmit[s] that hearsay to the jury"). Unlike Mejia, the expert in this case did not simply transmit hearsay from other gang members to the jury. The expert utilized out of court statements as part of the basis to form his expert opinion. Consequently, the expert's opinion was not testimonial and Petitioner's right to confront and cross-examine witnesses under Crawford was not implicated.

### C. ACTUAL INNOCENCE

Finally, Petitioner claims actual innocence based on a signed declaration by the victim, Raymond Rodriguez, attesting that he is now unsure about his testimony identifying Petitioner as the shooter during the trial. Pet'r Ex. B. "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." Herrera v. Collins, 506 U.S. 390, 400 (1993). After Herrera, courts generally have found that there can be no habeas relief based solely on a petitioner's actual innocence of the crime. See Coley v. Gonzalez, 55 F.3d 1385, 1387 (9th Cir. 1995); Swan v. Peterson, 6 F.3d 1373, 1384 (9th Cir. 1993), cert. denied, 513 U.S. 985 (1994).

In <u>Herrera</u>, the Supreme Court assumed without deciding that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." <u>Herrera</u>, 506 U.S. at 417. The Supreme Court has declined to answer the question left open in <u>Herrera</u> as to whether freestanding actual innocence claims (i.e., claims in which the petitioner argues that the evidence sufficiently establishes his innocence, irrespective of any constitutional error at trial or sentencing) are cognizable. <u>See</u> <u>House v. Bell</u>, 547 U.S. 518, 554-555 (2006). But the Ninth Circuit has held that a capital habeas petitioner may assert a freestanding actual innocence claim because a majority of the justices in <u>Herrera</u> would have supported such a claim. <u>See</u> <u>Carriger v. Stewart</u>, 132 F.3d 463, 476 (9th Cir. 1997) (en banc). In addition, the Ninth Circuit has assumed without deciding that freestanding actual innocence claims are cognizable in federal habeas proceedings in both capital and non-capital cases under the standard set forth in <u>Carriger</u>.

Nonetheless, the petitioner's burden in such a case is "extraordinarily high" and requires a showing that is "truly persuasive." <u>See</u> <u>id</u>. (quoting <u>Herrera</u>, 506 U.S. at 417). To be entitled to relief, the capital habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent. <u>See</u> <u>id</u>.; <u>Jackson v. Calderon</u>, 211 F.3d 1148, 1165 (9th Cir. 2000). Requiring affirmative proof of innocence is appropriate, because when a petitioner makes a freestanding claim of innocence, he is claiming that he is entitled to relief despite a constitutionally valid conviction. <u>See</u> <u>Carriger</u>, 132 F.3d at 476.

Here, the victim now contends that he is uncertain whether Petitioner was the person who shot him. The victim states that he identified Petitioner under police pressure because Petitioner also happened to resemble the person who shot him. However, a close examination of victim's declaration reveals that at most, he is uncertain about his identification of Petitioner as the shooter. In highly equivocal language, victim declares: "I am not positive that Mr. Rubalcava was the person who shot me." Pet'r Ex. B at 19. He adds: "[t]he only reason I testified to this was because Mr. Rubalcava looks like the person who shot me. Second, I was

told by Detective Perez [investigating detective] that there were other facts not known to me that existed, that made Mr. Rubalcava the shooter, and therefore made me believe that Mr. Rubalcava the right person." <u>Id.</u> at 20-24. The victim states that he "was and continue[s] to be concerned about the identification process of the defendant." <u>Id.</u> at 26.

The victim's declaration does not meet Petitioner's "extraordinarily high" burden to establish actual innocence nor is it "truly persuasive." As best, the victim, in hindsight, has expressed some doubt as to whether Petitioner, in fact, was the shooter. Nowhere does the victim state in clear terms that he is recanting his trial testimony because he misidentified Petitioner, and he does not state that Petitioner is *not* the person who shot him. Moreover, there is no evidence that the victim's brother, Eric, who identified Petitioner both in court and outside of court as the shooter, has recanted his testimony. Therefore, Petitioner's actual innocence claim must fail.

### D. CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners have recently been amended to require a district court that denies a habeas petition to grant or deny a certificate of appealability (COA) in its ruling. See Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254 (effective December 1, 2009). The Court declines to issue a COA in this case, as Petitioner has not demonstrated that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

## V. <u>CONCLUSION</u>

For the foregoing reasons,

IT IS HEREBY ORDERED THAT the petition for a writ of habeas corpus is DENIED. The Court declines to issue a COA. The Clerk of the Court shall enter judgment and close the file.

IT IS SO ORDERED.

Dated: March 9, 2010

_____
SAUNDRA BROWN ARMSTRONG
United States District Judge

\kei...\prisoner\rubalcava – order denying habeas . . . .